RALPH C. BRITTAIN v. PIEDMONT AVIATION, INC.

(Filed 24 May, 1961.)

**1. Aviation § 3:   Carriers § 18—**

A common carrier by aircraft is not an insurer of the safety of its passengers, but is under duty to exercise the highest degree of care for their safety as is consistent with the practical operation and conduct of its business.

**2. Trial § 22—**

On motion to nonsuit, the evidence favorable to plaintiff must be taken as true and the conflicting evidence disregarded, since the weight and credibility of evidence is in the exclusive province of the jury.

**3. Aviation § 3:   Carriers § 18—   Evidence of negligence of common carrier by air, resulting in injury to passenger, held for jury.**

In this action by a passenger of a common carrier by aircraft to recover for injuries during flight, defendant's evidence to the effect that in that area of the flight which crossed a mountain range the light

warning passengers to fasten seat belts was turned on because of expected air turbulence, with its evidence as to speed and time, permitting the conclusion that the accident occurred during such portion of the flight, together with plaintiff's evidence that the warning light was not burning when he left his seat, that the flight steward, immediately before the injury, handed him a cup of water while he was standing, without giving him any warning, and that minutes thereafter the plane dropped vertically for some distance in a downdraft, resulting in plaintiff's being thrown to the ceiling, to his injury, *is held* sufficient to be submitted to the jury on the issue of negligence of the carrier in failing to give plaintiff warning in an area in which defendant knew that downdrafts were apt to occur.

**4. Evidence § 14—**

Communications between physician and patient are privileged, and while the court may compel disclosure of such communications if in the court's opinion it is necessary to a proper administration of justice, whether the court should do so rests in its sound discretion. G.S. 8-53.

**5. Appeal and Error § 46—**

Where the court assigns no reason for a ruling upon a matter resting in its discretion, it will be assumed that the court made the ruling in the exercise of its discretion, it being incumbent upon the objecting party to request the court to make the record show that the ruling was made as a matter of law, if this be the case.

APPEAL by defendant from *Farthing, J.,* Regular Civil Schedule B, October 3, 1960 Term of MECKLENBURG.

Plaintiff began this action to recover damages for injuries suffered while a passenger on defendant's plane. His ticket entitled him to transportation from Charleston, W. Va., to Hickory, N. C., with a stop at Tri-Cities Airport (Near Johnson City, Tenn.). The flight was at night. The route from Tri-Cities Airport to Hickory crosses the Blue Ridge Mountains in the vicinity of Grandfather Mountain. Plaintiff was thrown and injured by a sudden and violent loss of altitude when he was in the washroom—in airline parlance, the "Blue Room." The rate of descent was sufficient to suck the contents of a Coca Cola bottle held by a passenger from the bottle and throw it to the ceiling.

Plaintiff alleges: The plane was equipped with safety belts for use by passengers when the plane was apt to make dangerous movements during ascent, descent, or when "flying through rough weather." There were no means of protection against such movements in the Blue Room. Lights inform passengers when to fasten their seat belts. Defendant knew "that the weather in the area in which Flight 26 was flying was and is usually rough, and therefore dangerous to fly through with safety belts unfastened, but the defendant negligently and care-

lessly failed to advise the plaintiff before the plaintiff left his seat for the washroom, by turning on the seat belt light or otherwise to fasten the safety belt about him." The flight attendant on the plane, with knowledge of the likelihood of air turbulence in the vicinity of the mountains, saw plaintiff leave his seat and go to the washroom without warning him of the danger of so doing. While in the washroom the plane encountered a downdraft, causing it to suddenly drop a great distance, throwing plaintiff to the ceiling, throwing the contents of the toilet out and on him and causing severe injuries.

Defendant admitted plaintiff was a passenger on its Flight 26, operating between Cincinnati, Ohio, and Wilmington, N. C. It denied it was negligent. It pleaded contributory negligence of plaintiff, alleging: "The route of this flight between the two airports was over the Blue Ridge Mountains, and close to the crest of Grandfather Mountain in Western North Carolina. There is usually some air turbulence in the area of these mountains, and therefore shortly after the take-off from the Tri-Cities Airport the seat belt light came on warning and instructing all passengers to remain in their seats and to fasten their seat belt." Plaintiff was in "a substantially intoxicated condition," when he entered the plane, and, contrary to defendant's orders, consumed alcoholic beverages while a passenger; failed to follow instructions of the flight attendant and the signal lamps warning him to remain in his seat and keep his seat belt fastened "at a time when the airplane of the defendant was entering a turbulent condition of air over the mountains of Western North Carolina."

After the original answer was filed, defendant was permitted to amend its answer to allege: "At the time and place of the passage of the defendant's airplane in the area of Grandfather Mountain, the weather was cold, clear, cloudless, and the winds were moderate. No rough air or turbulence was encountered approaching and flying over the higher portions of the mountains, but after leaving said area, the defendant's airplane encountered a severe downdraft which caused it to drop more or less vertically some distance. Said downdraft was clear-air turbulence, which could not be seen by eye or instrument, was unexpected, and could not be anticipated from existing weather conditions."

Issues of negligence, contributory negligence, and damage were submitted to and answered by the jury in favor of plaintiff. Judgment was entered on the verdict. Defendant excepted and appealed.

*Grier, Parker, Poe & Thompson for plaintiff appellee.*
*John H. Small for defendant appellant.*

RODMAN, J.   Defendant's principal assignment of error is directed to the refusal of the court to allow its motion for nonsuit. It argues here that there is no evidence to support the allegations of negligence, strenuously contending that all the evidence shows that the violent movement of the plane, which admittedly happened, occurred at a time and place where there was no reason to suspect any abnormal atmospheric conditions, asserting that the violent movement was due to what it refers to as clear-air turbulence.

The law applicable to this case was stated by *Moore, J.,* in *Jackson v. Stancil,* 253 N.C. 291, 116 S.E. 2d 817. He said: "Liability of a carrier of passengers by aircraft must be based on negligence. Such carrier is not an insurer of the safety of its passengers. . . . In North Carolina a distinction is made between the duties owed to passengers for hire by common carriers and private or contract carriers. It has been uniformly held by us that a common carrier owes its passengers the highest degree of care for their safety so far as is consistent with the practical operation and conduct of its business." He follows this statement by distinguishing between ordinary care and the highest degree of care. Briefly the distinction is the care which an ordinarily prudent carrier would exercise as compared with the care which an unusually prudent and competent carrier would exercise.

With apparent approval of the law enunciated in the *Stancil* case, *supra,* defendant requested the court in charging the jury to inform it that defendant contended: "The area of the mountain ridge including Grandfather Mountain usually or generally had some rough air or turbulence for airplanes flying across it, and for this reason Piedmont Airlines on the flight from Tri-Cities Airport to Hickory Airport as standard operating procedure required that the sign requiring that seat belts be fastened be on for the passage over this area. The defendant says that this was a general precaution followed whether actual turbulence was expected, or not, or whether actual turbulence was encountered, or not.

"The defendant says that no rough air or turbulence was encountered in the area where it might have been expected and that the airplane had proceeded beyond and east of the mountain area when the violent downdraft occurred."

The case was tried on defendant's theory of the law. The jury was told that plaintiff, to recover, had to establish (1) the injury occurred in an area where defendant knew downdrafts were apt to occur and for that reason owed a duty to warn its passengers, and (2) it failed to give such warning.

The question we are now required to answer is: Was there any evidence on which the jury could find these basic facts? We are not

called upon nor are we permitted to weigh the evidence. If a trial court is of the opinion that the jury has not properly evaluated the evidence, and its findings will result in a miscarriage of justice, it may prevent such injustice by setting the verdict aside.

Taking the requisite facts in inverse order, the record discloses plaintiff testified: "Before I got up out of my seat, the seat belt light was not on. I looked at it. I don't know exactly where the flight steward was, but I had asked him for a cup of water a few minutes prior to getting up . . . and as I got up and got to the door, he handed me a cup of water . . . I have false dentures and wanted to clean my teeth. That was the purpose for which I wanted the water. I don't know where the flight steward went after he handed me the water as I went directly inside." According to plaintiff the plane dropped just after he got in the Blue Room. On cross-examination he said: "When I stood up the last time to go to the Blue Room, the seat belt light was not on . . . The cup which the flight attendant handed me was a small paper cup with water in it, a flat-bottomed cup."

The flight attendant testified that the light warning passengers to fasten their seat belts came on at least five minutes prior to the time plaintiff was injured and remained on until after the injury. He said that the cup of water was given to plaintiff when he was in his seat and not as he was entering the Blue Room. There is evidence from other passengers tending to corroborate the flight attendant's statement that the warning light was on. But to determine whether it was or was not would be to weigh the evidence. We must accept plaintiff's version.

Did the injury occur in an area where air turbulence could be expected? Plaintiff testified: ". . . it was around Grandfather Mountain. I don't know whether it occurred before we reached Grandfather Mountain or after we reached Grandfather Mountain . . ." Defendant's evidence on this question was more specific. It was, we think, in part as least, susceptible to inferences favorable to plaintiff's contention. The co-pilot testified: "It (warning light) was turned off at approximately an altitude of 4,000 to 5,000 feet. It was turned on next in the vicinity of Heaton . . . The seat belt light was turned on over the village of Heaton, which is about ten miles previous to entering the mountain area." The pilot said the light "was next turned on approximately three or four minutes prior to approaching Grandfather Mountain, I would say in the vicinity of Heaton." Defendant in its brief informs us: "Because Heaton is in the right location and is always identifiable in flight by the radio range, it is the position on eastbound flights where the seat belt sign is turned on." The evidence fails to disclose such a definite point east of the mountains

where the area of turbulence terminates. It may be inferred from the testimony of the plane officials that Lenoir is such a point.

Defendant also informs us by brief that the distance from Tri-Cities to Heaton is 33 miles, to Lenoir, 62 miles, and to Hickory, 76 miles.

The co-pilot testified: "The air speed would have been approximately 227 knots, or nautical miles, slightly longer than the regular mile." The course from Tri-Cities to Hickory is 141 degrees. "The status of the winds in that area at that altitude was 280 degrees at about 40 miles per hour." The ground speed would, therefore, be something in excess of four miles per minute. The co-pilot fixed the place of injury as "in the vicinity of Lenoir. . . . This would be, roughly speaking, 18 or 20 miles from the ridges we had passed." Such position would be fourteen miles west of Hickory, slightly more than three minutes flying time, yet the flight attendant says that it was eight to ten minutes after the injury before arrival at Hickory. He also fixes the time elapsing between the giving of the warning signal until the injury as "at least five minutes." Accepting, as the jury could, five minutes as the period of time elapsing between the turning on of the lights and the injury, the plane would travel about twenty miles from the turning on of the lights and the moment of fall; but the jury could draw the inference that twelve to sixteen miles of this distance was west of Grandfather. The downsweep of the air takes place after passing the mountain range. The jury could infer from the testimony that the plane had only passed Grandfather some four miles when the downdraft which caused plaintiff's injury was encountered. If, in such close proximity, would not an unusually prudent man have expected the exact air turbulence or downdraft which the plane encountered? The original answer responds in the affirmative and asserts the light was on because in an area where turbulence could be expected.

Because there was evidence on which the jury could find both facts necessary to establish defendant's negligence, the court properly overruled the motion to nonsuit.

Plaintiff offered medical testimony in support of his assertion that he sustained serious and permanent injuries. Defendant called as one of its witnesses Dr. Coffey, who had treated plaintiff. Dr. Coffey had not been called or examined by plaintiff as a witness. On plaintiff's objection, the court excluded his testimony. Dr. Coffey, by stipulation of plaintiff, is an expert neurological physician. He was requested to examine plaintiff by Dr. Wrenn, a medical expert specializing in the field of orthopedic surgery. Dr. Wrenn treated plaintiff for the injuries sustained. He testified as an expert on plaintiff's behalf. Dr.

Coffey testified without objection that he examined plaintiff on 25 February 1959. He was then asked: "Q. Doctor, what was the result of that examination?" Defendant objected. The objection was sustained. Counsel for plaintiff stated that his objection was "on the ground that the examination of the plaintiff by Dr. Coffey constituted a communication between physician and patient, and information obtained therefrom by Dr. Coffey was privileged." The record discloses: "The Court stated that in his opinion the evidence was privileged and that the Court would not permit Dr. Coffey to testify as to his examination of the plaintiff, or as to information obtained therefrom." Our statute (G.S. 8-53) declares communications between surgeons and patients privileged and in general protects the surgeon from being compelled to disclose information obtained from his patient in order to furnish proper treatment, but the statute contains a provision "that the presiding judge of a superior court may compel such disclosure, if in his opinion the same is necessary to a proper administration of justice." Counsel for defendant insists that the evidence excluded was competent, relying on *Capps v. Lynch*, 253 N.C. 18, 116 S.E. 2d 137. The distinction between that and the present case is, we think, readily apparent. First, there is nothing to indicate that Dr. Coffey would have given any testimony beneficial to defendant, but passing that point, we think it clear that defendant has not brought himself within the statutory proviso. It is said in *Capps v. Lynch, supra:* "In the instant case the trial judge was vested with discretionary authority in accordance with the rule stated above, to compel the surgeon to give testimony of his examination, findings, surgery, treatment and prognosis. This, counsel aptly brought to the attention of the court. The court denied categorically that he had such discretion and ruled as a matter of law that the proffered evidence was absolutely privileged."

If it appeared that the court excluded the testimony of Dr. Coffey because he was compelled by statute to do so, we would direct a new trial; but the record, we think, clearly negatives any idea that the ruling was based on want of authority. The use of the word "permit" implies a discretion and a refusal because the court did not deem the evidence necessary to a proper administration of justice.

When no reason is assigned by the court for a ruling which may be made as a matter of discretion for the promotion of justice or because of a mistaken view of the law, the presumption on appeal is that the court made the ruling in the exercise of its discretion. *Phelps v. McCotter*, 252 N.C. 66, 112 S.E. 2d 736; *Ogburn v. Sterchi Bros.*, 218 N.C. 507, 11 S.E. 2d 460; *Warren v. Land Bank*, 214 N.C. 206,

198 S.E. 624; *Hogsed v. Pearlman*, 213 N.C. 240, 195 S.E. 789; *Jones v. Insurance Co.*, 210 N.C. 559, 187 S.E. 769. If a party adversely affected by the ruling desires to review it on appeal, he may request the court to let the record show whether the ruling is made as a matter of law or in the exercise of the court's discretion.

We have carefully reviewed the other assignments of error but find nothing that we deem prejudicial or requiring discussion. Hence we reach the conclusion there is

No error.