STATE OF NORTH CAROLINA v. REGINALD VAN JOHNSON

No. 434A96

(Filed 9 May 1997)

**Criminal Law § 503 (NCI4th Rev.)— review of testimony— denial of jury request—failure to exercise discretion**

The trial court in a prosecution for first-degree statutory rape and taking indecent liberties with a child improperly failed to exercise its discretion, as required by N.C.G.S. § 15A-1233(a), in denying the jury's request to review the testimony of the victim and her aunt where the trial court's statement, "I'll need to instruct you that we will not be able to replay or review the testimony for you," and the trial court's statement immediately thereafter that it "can review further instructions" indicate that the trial court believed it did not have discretion to grant the jury's request. Moreover, this error was prejudicial where the testimonies sought to be reviewed were central to the case and involved issues of some confusion and contradiction.

**Am Jur 2d, Trial §§ 1647 et seq.**

Appeal by the State pursuant to N.C.G.S. § 7A-30(2) from the unpublished decision of a divided panel of the Court of Appeals, 123 N.C. App. 790, 476 S.E.2d 148 (1996), granting the defendant a new trial. Heard in the Supreme Court 17 March 1997.

*Michael F. Easley, Attorney General, by Jane Rankin Thompson, Assistant Attorney General, for the State-appellant.*

*Terry W. Alford for defendant-appellee.*

LAKE, Justice.

The defendant was indicted on 28 February 1994 for first-degree statutory rape and taking indecent liberties with a child. The defendant was tried before a jury, and the jury found the defendant guilty of both offenses. Judge W. Osmond Smith III consolidated the offenses for judgment and sentenced defendant to a term of life imprisonment. The Court of Appeals determined that the trial court committed prejudicial error and that defendant is entitled to a new trial. The State appeals from that decision. For the reasons stated herein, we agree with the Court of Appeals and conclude that the defendant is entitled to a new trial.

STATE v. JOHNSON

[346 N.C. 119 (1997)]

At trial, evidence was presented tending to show that on Saturday, 9 October 1993, the defendant, seventeen-year-old Reginald Van Johnson, was spending the weekend at the home of his aunt and uncle. Present in the home that evening were seven children: three were the children of defendant's aunt and uncle (defendant's cousins); three were the children of his aunt's cousin Barbara; and the last was Barbara's five-year-old niece, "J". Defendant agreed to baby-sit the children while his aunt and Barbara went out that night. Defendant often baby-sat Barbara's three children, but had never seen J prior to that night. Defendant's uncle did not go with the women and was present in the home all night.

Defendant's aunt and Barbara left the house at approximately 1:20 a.m. Defendant's three cousins were asleep in a bedroom at that time, and the remaining four children, including J, were asleep in the living room. As the women were leaving, defendant's uncle walked to the front door to tell them something and inadvertently stepped on J, who was lying on the floor. J woke up immediately and began to cry. She then moved to the mattress beside her cousin Jerome and went back to sleep.

Defendant's uncle testified that he dozed off and on in his bedroom while the women were gone, but that he did not hear any unusual noises from the living room where the defendant and J were. The children present saw nothing unusual, nor did they hear any moaning, crying or screaming that night. The defendant testified that he spent most of his time baby-sitting lying on the floor near the kitchen and talking to a girlfriend on the telephone. He also testified that J was asleep the entire time and that he never touched her in any manner.

Defendant's aunt and Barbara returned home at approximately 2:45 a.m. Barbara testified that the defendant was on the phone when they entered the house. J was "hard asleep," and Barbara had difficulty getting J to wake up. J's clothes were in the same condition as when Barbara left, and the only thing that was different was that J was on a mattress instead of lying on the floor. Barbara took her three children and J back to her house. Later, on Sunday, 10 October 1993, Barbara overheard J and her son Jerome talking about telling Barbara something. When Barbara asked J what they were talking about, J told her that the defendant had "rocked" her the night before. Barbara took this to mean some type of sexual contact. J also told Barbara that the defendant had taken her pants off but that he had

not taken off her panties. Barbara stated that J never used the term "walked" in describing the alleged incident and that the term usually came from her own child.

J's mother, Charlene, picked J up later that day. J told her mother that defendant had "walked on her." Charlene asked J to explain what she meant, and J "did a back and forth rocking motion." Charlene was familiar with this "walked on her" expression because J had used it previously to describe the same back and forth rocking motion while playing "mamma and daddy" with her cousin Jerome. Later that day, J complained to her mother "that her privates were hurting." Her mother examined J's genital area and described it as swollen and irritated.

The next day, 11 October 1993, Charlene took J to the emergency room at Granville Medical Center where she was examined by Dr. Robert Wallison. Dr. Wallison's examination revealed that J's "external genitalia showed some mild redness, indicating irritation of sorts," and that a portion of the interior of her vagina also appeared irritated. J's vaginal opening was enlarged beyond that expected of a five year old, and there was "a small amount of a whitish, mucoid kind of discharge" inside her vagina. The discharge was explained as either a "benign discharge . . . caused by normal bacteria that grows in the vagina" or a minor infection unrelated to any sexual activity. Dr. Wallison testified there was no trace of blood in the vaginal area, no abnormal vaginal tearing and no evidence of "male sexual hormones or semen."

The Franklin County Department of Social Services and the Louisburg Police Department were informed of the incident. Detective Ralph Brown of the Louisburg Police Department interviewed J, and J related essentially the same story she had told her mother. On 20 October 1993, Gladys Alston of the Franklin County Department of Social Services conducted an interview with J using anatomical dolls. The interview was videotaped, was introduced into evidence and was shown to the jury.

Upon referral to the Child Medical Evaluation Clinic of the University of North Carolina Hospitals ("clinic"), J was interviewed on 19 November 1993 by mental health consultant Janet Hadler. Ms. Hadler testified that when she asked J who touched her genitals, J first responded it was a woman named "Nici." When Ms. Hadler later asked, "Was there something you told your mom? Was there something [that] happened at your house or at someone else's house?" J

STATE v. JOHNSON

[346 N.C. 119 (1997)]

responded by telling her about an incident at defendant's house. J told her that defendant had taken both of their clothes off and had touched her with "his pee pee thing." J also told Ms. Hadler that defendant had touched her more than once and on different days.

Dr. Michael Knudsen, a pediatrician, examined J while she was at the clinic on 19 November 1993. During his examination, Dr. Knudsen observed no abnormalities of the external vaginal features, and J's labia major appeared normal. There was a small amount of discharge and a "very small amount of actual erythema, or reddening, to the edges of her labia minora." A culture of the discharge revealed it to be the result of an overgrowth of bacteria flora, common for children of J's age. J's hymen was intact, and there was no tenderness. Dr. Knudsen compared his notes with Dr. Wallison's notes and opined, "I think that the difference in findings from my examination and from his examination make it highly, highly probable that penetration by a male penis could have occurred." However, on cross-examination, Dr. Knudsen stated that all of the results of his examination were normal, with the exception of the small amounts of redness that could have been caused by any number of things, including trauma, pressure, irritation and infection.

J testified at trial. Her testimony, however, was frequently self-contradictory. She initially stated that she did not know the difference between the truth and a falsehood, but later appeared to demonstrate an understanding of the terms when asked a series of short questions by the prosecutor. When asked to identify the defendant, J could not do so; she stated that she did not know the defendant and that she had not seen him during the weekend of 9 October 1993. However, she later stated that she did see the defendant and that he "walked" on her and "put [his penis] inside my pee pee thing." When asked whether she "[woke] up when [defendant] put his pee pee thing in [her] pee pee thing," J responded "no." When asked how long she had been on the living room floor when defendant touched her, J answered "four days." When asked about the "walked on" expression, J stated she had just thought of the term.

Tiffany Johnson, the eleven-year-old daughter of defendant's aunt, was present on the night of 9 October 1993 and also testified at the trial. She stated that she did not hear or see anything unusual that night, even though she got up once to get some water and even though she was awake when her mother and Barbara returned home. However, she testified that earlier that day, J had told her that J's

cousin Jerome had "done it to her" at her Aunt Barbara's house. Tiffany did not tell anyone about this.

At the close of all the evidence, defendant renewed his motion to dismiss, which was denied. The trial court instructed the jurors and sent them to the jury room for deliberations.

The specific events giving rise to this appeal occurred during jury deliberations. Sometime after retiring to the jury room for deliberations, the jurors indicated that they had a question. The jury returned to the courtroom, and the following exchange occurred:

COURT: Do I understand the jury has a question?

FOREPERSON: We would like to hear Barbara's testimony, if possible, and—and, ah, [J's] testimony as far as the—that was the next, ah—

ANOTHER JUROR: It was the first.

FOREPERSON: —The very first.

COURT: I'll need to instruct you that we will not be able to replay or review the testimony for you. I can review further instructions, and try to read them a little better than I did, but that of course is not a summary of the evidence. But I will instruct you that it's your duty to consider the evidence as you recall it, and consider the view of other jurors, again, reaching in your minds as to what that testimony is.

The jury then resumed deliberations. Subsequently, the jury returned verdicts of guilty on both the counts of first-degree statutory rape and taking indecent liberties with a child.

The sole issue to be addressed is whether the trial court exercised discretion, as required by N.C.G.S. § 15A-1233(a), in its decision not to let the jurors review the testimony of J and her Aunt Barbara. The defendant contends that the language used by the trial court in its denial of the jurors' request indicates that the trial court did not believe it was statutorily permitted to let the jurors review the testimony. Thus, defendant maintains the trial court failed to consider the request under the statutorily required discretionary standard. We find defendant's argument to be persuasive.

N.C.G.S. § 15A-1233(a) governs the trial court's duty regarding jury requests to review trial testimony:

(a) If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence. In his discretion the judge may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

N.C.G.S. § 15A-1233(a) (1988). It is a well-established rule in North Carolina that the decision whether to grant or refuse a request by the jury for a restatement of the evidence after jury deliberations have begun lies within the discretion of the trial court. *State v. Hough,* 299 N.C. 245, 262 S.E.2d 268 (1980); *State v. Ford,* 297 N.C. 28, 252 S.E.2d 717 (1979); *State v. Fulcher,* 294 N.C. 503, 243 S.E.2d 338 (1978). The statutory requirement of N.C.G.S. 15A-1233(a) that the trial court exercise its discretion is a codification of this common-law rule. *State v. Fullwood,* 343 N.C. 725, 742, 472 S.E.2d 883, 892 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 339 (1997); *State v. Ashe,* 314 N.C. 28, 34, 331 S.E.2d 652, 656 (1985). When a motion addressed to the discretion of the trial court is denied upon the ground that the trial court has no power to grant the motion in its discretion, the ruling is reviewable. *Calloway v. Ford Motor Co.,* 281 N.C. 496, 505, 189 S.E.2d 484, 490-91 (1972). "In addition, there is error when the trial court refuses to exercise its discretion in the erroneous belief that it has no discretion as to the question presented. Where the error is prejudicial, the defendant is entitled to have his motion reconsidered and passed upon as a discretionary matter." *State v. Lang,* 301 N.C. 508, 510, 272 S.E.2d 123, 125 (1980) (citing, e.g., *Ford,* 297 N.C. 28, 252 S.E.2d 717; *Ford Motor Co.,* 281 N.C. 496, 189 S.E.2d 484; *Tickle v. Hobgood,* 212 N.C. 762, 194 S.E. 461 (1938)).

We hold that the trial court's response to the jury's request in this case must be interpreted as a statement that the trial court believed it did not have discretion to consider the request. First, the precise words chosen by the trial court strongly indicate that it did not believe it had the discretion to grant the jurors' request. The trial court told the jury, "I'll *need* to instruct you that we *will not be able* to replay or review the testimony for you." (Emphasis added.) Among other things, a "need" is defined as "a requirement, necessary duty, or obligation," a "necessity arising from existing circumstances." *Random House Webster's College Dictionary* 904 (1991). "Able" is

**STATE v. JOHNSON**

[346 N.C. 119 (1997)]

defined as "having the necessary power, skill, resources, or qualifications to do something." *Id.* at 3. Taken together, the trial court's denial, in these words as defined, can be rephrased as, "I am required to instruct you that we do not have the power or qualifications to review the testimony for you." Examined in this light, the trial court's words clearly indicate it did not exercise discretion in denying the request. Second, the context of the trial court's denial indicates it did not believe it had discretion to grant the request. The trial court first tells the jury that it "will not be able to replay or review the testimony." The trial court then immediately goes on to tell the jury that it "*can* review further instructions." (Emphasis added.) This juxtaposition of determinations—what it cannot do set off against what it can do—is telling. Combined with the subsequent admonishment that it is the jurors' "duty to consider the evidence as [they] recall it," the trial court's comments are indicative of its understanding that it was not empowered to let the jurors review the testimony at issue.

The State argues that the language used by the trial court in this case is substantially the same as that held not to be erroneous in *Fulcher*, 294 N.C. at 514, 243 S.E.2d at 346 ("I am not going to be able to allow the testimony of these various witnesses to be read back to you . . . ."). However, a careful reading of *Fulcher* reveals that the discretion issue was not addressed on appeal. *Id.* The basis of this Court's decision, as framed by the defendant, was that the trial court had not expressed an improper *opinion* about the value of the testimony in question by virtue of its refusal to let the jury review it. *Id.* As a result, the decision in *Fulcher* is inapposite to the resolution of the issue at bar. Even if discretion had been at issue, the language used by the trial court in *Fulcher* is markedly different from that used in this case when viewed in the context of the trial court's entire statement. The entire sentence of the trial court's denial in *Fulcher* reads, "I am not going to be able to allow the testimony of these various witnesses to be read back to you, for if you emphasize certain portions of it out of context it might tend to exaggerate it." *Id.* As can be seen, the trial court gave a reason for its denial, the prevention of improper emphasis. Such reasoning indicates exercise of discretion. In the present case, no such reason is given for the denial *except* the erroneous statement that the trial court is not able to let the jury review the testimony.

The State also contends that the Court of Appeals failed to give the trial court the presumption of discretion to which it is entitled under *Brittain v. Piedmont Aviation, Inc.*, 254 N.C. 697, 120 S.E.2d

72 (1961). Such is not the case. "When no reason is assigned by the court for a ruling which may be made as a matter of discretion . . . , the presumption on appeal is that the court made the ruling in the exercise of its discretion." *Id.* at 703, 120 S.E.2d at 76. However, where the statements of the trial court show that the trial court did not exercise discretion, as is evident in the present case, the presumption is overcome, and the denial is deemed erroneous.

Having determined that the trial court erred in not exercising its discretion in determining whether to permit the jury to review some of the testimony, we now consider whether these errors were so prejudicial as to entitle defendant to a new trial. We conclude they were. The evidence requested for review by the jury in this case was clearly "material to the determination of defendant's guilt or innocence." *Lang*, 301 N.C. at 511, 272 S.E.2d at 125. The testimonies of both J, the victim, and her Aunt Barbara were central to this case, and both testimonies involved issues of some confusion and contradiction. The medical evidence was inconclusive as to whether J had been raped, and there was no medical proof linking the defendant to the alleged crimes. Further, there were no eyewitnesses to the alleged crimes and no witnesses who heard or saw anything unusual. Thus, J's testimony was crucial because it was the only evidence directly linking defendant to the alleged crimes. As such, J's credibility was the key to the case. J's testimony was likely difficult for the jury to follow or assess due to its often confusing and self-contradictory nature. Barbara's testimony was also important because she was the first person J told about the alleged incident, and she also had information about the incident with J's cousin Jerome, about which J and Tiffany testified. "Thus, whether the jury fully understood the [witnesses' testimony] was material to the determination of defendant's guilt or innocence. Defendant was at least entitled to have the jury's request resolved as a discretionary matter, and it was prejudicial error for the trial judge to refuse to do so." *Id.*

For the foregoing reasons, the decision of the Court of Appeals is affirmed.

AFFIRMED.