McGEE, Chief Judge.
 

 *698
 
 Devonte Shawmar Lyons ("Defendant") appeals his convictions for first-degree murder under the felony murder rule, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. Defendant contends he was prejudiced by the trial court's failure to exercise its discretion pursuant to N.C. Gen. Stat. § 15A-1233(a) to permit the jury to review certain witness testimony. We find no prejudicial error.
 

 I. Background
 

 The evidence at trial tended to show the following: Defendant, Aryka Roberts ("Roberts"), Rashad Schenck ("Schenck"), and Jessica Edwards ("Edwards") gathered at the residence of their mutual friend, Garrett Frederick ("Frederick"), in Kings Mountain around 6:30 p.m.
 

 *699
 
 on 13 March 2012. Roberts was Defendant's girlfriend. Schenck and Edwards were dating each other. The four of them sat in a sunroom where they smoked marijuana and listened to music. Roberts called a "chat line" used for "meet[ing] men [in the area] who want to talk or do other things." Roberts explained the chat line process at trial: "You just call and [record] a [voicemail] greeting and either [the men] can message you or you message them." Using the speakerphone, Roberts began playing messages men had left for her on the chat line.
 

 One of the messages was from a man with a heavy foreign accent. Roberts decided to send him a message, and she and the man had a brief conversation over the phone making "small talk[ ]." Roberts told the man she lived in Kings Mountain and asked him to meet her there. Later, when asked why the man was interested in meeting her, Roberts testified "[she] told him for sex." Roberts and the caller exchanged phone numbers. After hanging up, Defendant and Roberts decided to "rob [the man with the accent] and get [his] money."
 

 Defendant, Roberts, Schenck, and Edwards left Frederick's residence together around 9:00 p.m. and drove in a 1998 Toyota Camry ("the Camry") belonging to Roberts to Ebenezer, a small community outside Kings Mountain. During the ten-minute drive to Ebenezer, they discussed whether Roberts should meet the man at a hotel, but it was ultimately decided that Roberts should meet him at 206 Putnam Place, a vacant house where her father used to live. Along the way, they stopped at another home and picked up
 
 *758
 
 Schenck's cousin, Sheldon Thompson ("Thompson"). Roberts was "on and off [Defendant's cell phone]" with the man they intended to rob, giving him driving directions to Ebenezer from Charlotte. Roberts testified that
 

 [t]he plan [they developed while on the way to Ebenezer] was for [Roberts] to go get in [the man's] car. [Edwards] was going to wait in [Roberts's] car ... at [a neighbor's] house. [Defendant, Schenck, and Thompson] were supposed to hide in the bushes, come up to the car, scare the man and only rob him, and we [were] all supposed to go back to my car and leave.
 

 Roberts "didn't remember ... having a conversation about who [specifically] was going to take the money."
 

 Schenck testified Defendant was supposed to get the money using a gun, and Schenck was supposed to "watch out [from the Camry] ... to make sure ... nothing happen[ed] to [Defendant]." Schenck also
 
 *700
 
 testified it "was not unusual for [him] to back up [Defendant] in a prostitution situation ... involving [Roberts]."
 

 They next stopped at Schenck's grandmother's house in Ebenezer. Roberts and Schenck went inside and Defendant and Edwards remained in the Camry. The man from the chat line "was calling back and forth on [Defendant's] phone" and Edwards spoke to him while Roberts was inside Schenck's grandmother's house. When Schenck and Roberts returned to the car, Roberts drove "right down the road ... [about] a minute" and parked at the residence of her family friend, Wayne Bell ("Bell"). Roberts spoke over the phone to the man a final time to give him specific directions to 206 Putnam Place.
 

 At Bell's house, Defendant, Roberts, Schenck and Thompson got out of the Camry and Edwards got into the front seat. Defendant, Roberts, Schenck and Thompson walked through Bell's backyard and approached the back of the house at 206 Putnam Place. Roberts went to the left of the house and the others went to the right. Roberts could see a white Cadillac ("the Cadillac") parked in the driveway of 206 Putnam Place. Roberts got in the Cadillac's passenger side and the driver introduced himself to her as Francis Munufie ("Munufie"). After talking to Munufie briefly, Roberts got out of the Cadillac and went back behind the house, where she spoke with Defendant, who was still with Schenck and Thompson. Roberts testified she was "really nervous and antsy" and told Defendant that Munufie "was ... touching [her] uncomfortably, and [she] wanted for it to be over." She asked "what the holdup was." Defendant told Roberts: "Shut up. We got this. We're going to do this. We're coming." Roberts had not seen Defendant with a weapon at that point.
 

 Roberts returned to the Cadillac. Defendant came up to the driver's side door and "knocked on the window with a gun." Defendant told Munufie to get out of the Cadillac and tried to open the door, but it was locked. Roberts unlocked the door from inside. Roberts testified she immediately got out and ran to the back of 206 Putnam Place and then to the Camry parked in Bell's driveway. She heard four or five gunshots as she ran.
 

 Schenck testified that Munufie opened the door and Defendant began "reach[ing] for [Munufie's] pockets" while Munufie was still sitting in the Cadillac. Defendant told Munufie to get out of the car and when Munufie did, "[Defendant] had the gun in [Munufie's] face telling him to give [Defendant] the money." Munufie motioned as if he was going to pull something out of his back pocket, but brought his hand up empty.
 

 *701
 
 Defendant was still holding the gun in Munufie's face, demanding money, and Munufie "slapped [at] the gun." Schenck testified that after Munufie slapped the gun a third time, Defendant shot Munufie in his left upper arm. Schenck, Roberts, and Thompson then ran back to the Camry. As he was running, Schenck heard "multiple [gun] shots." Edwards testified that, while waiting in the Camry, she "heard five or six gunshots. And less than a minute later [Schenck, Thompson, and Roberts] were in the back seat [of the Camry] and [Roberts] told me to go."
 

 According to Roberts, Defendant returned to the Camry last, and "jump[ed] in the front seat" as Edwards was pulling out of Bell's driveway. Edwards drove away, but "ran off
 
 *759
 
 the side of the road at one point because [she] was shook [up]." Edwards testified "[e]verybody was frantic. [Roberts] was like, 'What happened? What happened? Did you kill him?' And [Defendant] said, 'I don't know. I shot him in the face.' And that's-I think at that point I swerved off the road. [Defendant] said, 'I'm sorry. I'm sorry.' " Schenck testified Roberts was "screaming [at Defendant] ... [asking] did [Defendant] shoot the dude." According to Schenck, Defendant did not respond at first, but eventually said, "I had to do it." Roberts testified she "was ... crying really bad and ... [asking Defendant] 'What happened? What happened?' " and that Defendant simply responded, "I'm sorry."
 

 Roberts switched seats with Edwards and began driving. She drove to the apartment of Schenck's cousin, Angelica Adams ("Adams"), in Gastonia. At Adams's apartment, the group sat in the living room smoking marijuana. According to Roberts, Defendant asked Adams for "[s]ome Comet or some bleach or some kind of stuff to clean with" and went to the bathroom. Around 3:00 a.m., Adams drove Edwards to her home in Galilee and drove Schenck and Thompson back to Ebenezer.
 

 Roberts and Defendant got in the Camry parked outside Adams's apartment and talked for about twenty minutes. Roberts later told police that, after Adams and the others left, Roberts saw Defendant wrap a gun in a yellow t-shirt and hide it under some stairs at the apartment complex. Around 6:00 a.m., Defendant and Roberts went to Defendant's mother's apartment in Kings Mountain. They fell asleep briefly, but were awakened by police knocking on the door of the apartment. Two officers spoke with Roberts and Defendant separately. Roberts testified she "[b]asically gave [the officers] the runaround, a bunch of lies, jumbled up lies." Before leaving, the officers told Roberts they wanted to talk to her again. They also seized the Camry, saying it had been seen near 206 Putnam Place the previous night.
 

 *702
 
 Deputy Jimmy Ellis ("Deputy Ellis") of the Cleveland County Sheriff's Office ("CCSO") testified he responded to a 911 call around 10:55 p.m. on 13 March 2012 reporting five or six gun shots fired near Putnam Place in Ebenezer. Deputy Ellis observed a white Cadillac parked in the driveway at 206 Putnam Place. The vehicle's lights were on, and there was music blaring loudly from inside. As Deputy Ellis approached the Cadillac, he saw the driver's side door was open and found a man, later identified as Francis Munufie, lying on his back with an apparent gunshot wound to his head. Deputy Ellis radioed a request for EMS and backup deputies. A number of officers arrived and began canvassing the neighborhood. Investigators spoke with Bell, who informed them he had seen Roberts and several others in her Camry parked nearby earlier that evening. Police found four spent nine millimeter gun shell casings in the grass and driveway ten to fifteen feet from Munufie's body.
 
 [1]
 

 A medical examiner performed an autopsy on Munufie's body on 14 March 2012, and determined Munufie suffered gunshot wounds to the left side of his head, to his upper right, and "graze wounds" to the right side of his abdomen. The examiner collected an intact bullet from behind Munufie's right collarbone, several small bullet fragments from Munufie's arm, and a small bullet fragment located near Munufie's jawbone. The bullet and bullet fragments were packaged as evidence and returned to CCSO. CCSO investigators also discovered a bullet fragment lodged in the interior of Munufie's Cadillac when the vehicle was processed for fingerprints on 16 March 2012. The shell casings, bullet and bullet fragments, and a subsequently recovered firearm were all sealed and delivered to the State Bureau of Investigation's Western Lab by CCSO Detective Gary Lee for ballistics testing.
 

 Throughout the week following Munufie's death, investigators interviewed Defendant, Roberts, Schenck, Thompson, and Edwards. Roberts submitted fingerprint and DNA samples on 20 March 2012. On the way to the
 
 *760
 
 Law Enforcement Center for fingerprinting, Roberts told detectives she had been involved with the attempted robbery of Munufie. Roberts also suggested investigators should search Adams's apartment building in Gastonia for the gun used during the robbery attempt. The same day, CCSO Sergeant Mark Craig ("Sgt. Craig") went to Adams's apartment, where he found a nine millimeter, semi-automatic handgun wrapped in a yellow t-shirt underneath a staircase on the outside of the building.
 
 *703
 
 Roberts later agreed to speak to Defendant while wearing a hidden audio recording device. She testified Defendant was "real standoffish" during the conversation and "kept telling her to shut the fuck up, and [saying] he didn't want to talk about [the robbery attempt]."
 

 CCSO Detective Jessica Woosley ("Det. Woosley") testified Defendant was arrested on 23 March 2012 on charges of first-degree murder, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. Roberts, Schenck, Edwards, and Thompson were also arrested on the same charges and later entered into plea agreements with the State. A grand jury indicted Defendant on 9 April 2012 for first-degree murder, robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon.
 

 Roberts, Schenck, Edwards, and Thompson testified for the State at Defendant's trial on 13 July 2015. Deborah Chancey ("Chancey"), a firearms analyst at the State Crime Lab, testified regarding her analysis of the four fired shell casings, five bullets and/or bullet fragments, and handgun submitted to the Crime Lab for testing. It was Chancey's opinion that the shell casings exhibited "a sufficient amount of agreement" with casings test-fired from the handgun received by the Crime Lab. However, Chancey also testified that although the bullet and bullet fragments received by the Crime Lab "exhibited some agreement of detail with the test-fires, ... the amount of agreement was not sufficient to identify [them] to any particular firearm."
 

 Erin Ermish ("Ermish"), a DNA analyst at the State Crime Lab, testified about forensic testing she performed on a number of items of evidence in the case, including DNA swabbings from the exterior driver's side door handle of Munufie's Cadillac; the gun recovered from Adams's apartment; and the yellow t-shirt that had been wrapped around the gun. On cross-examination, Ermish testified, "For any of the items that I tested, I did not get a match between [Defendant's] [DNA] profile and the DNA [detected on the item]." Defendant did not testify or present any additional evidence.
 

 At the close of the evidence, but prior to closing arguments, the trial court instructed the jury:
 

 As jurors you are often referred to as the fact finders, which simply means that it's up to you to find the true facts in this case from the evidence according to what your recollection of the evidence is. When you go back and start deliberating, if six of you say, Well, I remember this witness says things this way and the other six of you say No, I
 
 *704
 
 don't remember it that way, ...
 
 you don't have the option of saying
 
 , Well, let's go ask the judge and let the judge tell us what did that witness really say. Because if you ask that question, my response is going to be, That's part of your job, to figure it out and to make that determination based on your recollection and not what I say the evidence is, what [the lawyers] say the evidence is, but what you say the evidence is. That's why you've been listening so carefully, so that you can determine the true facts from the evidence as you find the evidence to be.
 

 After closing arguments, the trial court further instructed the jury, "If you need to review any exhibits or if you have any questions, please write out such request and ... I will bring you back into the courtroom to address any such questions or requests." Defendant was convicted on 30 July 2015 of first-degree felony murder, attempted robbery with a dangerous weapon,
 
 [2]
 
 and conspiracy to commit robbery with a dangerous
 
 *761
 
 weapon. The trial court arrested judgment on the conviction for attempted robbery with a dangerous weapon and consolidated the remaining convictions into a single judgment. Defendant was sentenced to an active term of life in prison without parole. Defendant gave notice of appeal in open court.
 

 II. Jury Instructions Regarding Witness Testimony
 

 A.
 
 Standard of Review
 

 Defendant contends the trial court violated a statutory mandate requiring trial courts to exercise discretion in considering jury requests to review witness testimony or other evidence. Specifically, N.C. Gen. Stat. § 15A-1233(a) provides in part:
 

 If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence.
 

 *705
 
 N.C. Gen. Stat. § 15A-1233(a) (2015). According to Defendant, certain comments made by the trial court to the jury prior to closing arguments demonstrate the court's failure to exercise discretion as directed by the statute. Defendant's argument is reviewable despite the fact that he did not raise this objection at trial.
 
 See
 

 State v.
 

 Starr
 
 ,
 
 365 N.C. 314
 
 , 317,
 
 718 S.E.2d 362
 
 , 365 (2011) ("When a trial court violates [ N.C.G.S. § 15A-1233(a) ] by denying the jury's request ... upon the ground that the trial court has no power to grant the motion in its discretion, the ruling is reviewable, and the alleged error is preserved by law even when the defendant fails to object." (citation and internal quotation marks omitted)). "Alleged violation of a statutory mandate presents a question of law, which we review
 
 de novo
 
 on appeal."
 
 Dion v. Batten
 
 , --- N.C.App. ----, ----,
 
 790 S.E.2d 844
 
 , 852 (2016).
 

 A trial court's failure to exercise its discretion under N.C.G.S. § 15A-1233(a) warrants a new trial only where the error was prejudicial.
 
 See
 

 State v. Johnson
 
 ,
 
 164 N.C.App. 1
 
 , 20,
 
 595 S.E.2d 176
 
 , 187 (2004). Accordingly, to prevail in the present appeal, Defendant must show not only a failure by the trial court to exercise its discretion but also "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at [his] trial[.]"
 
 See
 
 N.C. Gen. Stat. § 15A-1443(a) (2015) ;
 
 State v. Hatfield
 
 ,
 
 225 N.C.App. 765
 
 , 769,
 
 738 S.E.2d 236
 
 , 239 (2013).
 

 As this Court recently held upon its review of relevant case law,
 

 a trial court's error in failing to exercise its discretion in denying a jury's request to review testimony constitutes prejudicial error when the requested testimony (1) is 'material to the determination of [a] defendant's guilt or innocence'; and (2) involves 'issues of some confusion or contradiction' such that the jury would want to review this evidence to fully understand it.
 

 State v. Chapman
 
 , --- N.C.App. ----, ----,
 
 781 S.E.2d 320
 
 , 327 (2016) (quoting
 
 State v. Johnson
 
 ,
 
 346 N.C. 119
 
 , 126,
 
 484 S.E.2d 372
 
 , 377 (1997) ).
 

 B.
 
 Analysis
 

 1.
 
 Exercise of Discretion Under N.C.G.S. § 15A-1233(a)
 

 Our Supreme Court has observed that N.C.G.S. § 15A-1233(a) codifies "the long-standing common law rule that the decision whether to grant or refuse a request by the jury for a restatement of the evidence lies within the discretion of the trial court."
 
 State v. Barrow
 
 ,
 
 350 N.C. 640
 
 , 646,
 
 517 S.E.2d 374
 
 , 378 (1999). It is error for a trial court to make
 
 *706
 
 statements that, even considered contextually, "suggest[ ] the trial court [does] not have discretion to grant the jury's request [to review witness testimony]."
 
 See
 

 Hatfield
 
 ,
 
 225 N.C.App. at 771
 
 ,
 
 738 S.E.2d at 240
 
 . For example, a trial court fails to exercise its discretion to deny a jury's request to review witness testimony by responding that a transcript is "not available,"
 
 see
 

 State v. Lang
 
 ,
 
 301 N.C. 508
 
 , 511,
 
 272 S.E.2d 123
 
 , 125 (1980), or that the court lacks "the ability" to present the transcript to the jury,
 
 see
 

 Barrow
 
 ,
 
 350 N.C. at 648
 
 ,
 
 517 S.E.2d at 379
 
 .
 
 See
 

 *762
 

 also
 

 Johnson
 
 ,
 
 346 N.C. at 124
 
 ,
 
 484 S.E.2d at 376
 
 (holding trial court failed to exercise its discretion to grant jury's request where "[t]he trial court told the jury, 'I'll
 
 need
 
 to instruct you that we
 
 will not be able
 
 to replay or review the testimony for you." (emphases in original));
 
 Hatfield
 
 ,
 
 225 N.C.App. at 771
 
 ,
 
 738 S.E.2d at 240
 
 (holding trial court failed to exercise its discretion in considering jury's request where, after jury requested review of witness testimony, "the trial court simply told the jury, '[w]e can't do that.' ");
 
 State v. Thompkins
 
 ,
 
 83 N.C.App. 42
 
 , 45,
 
 348 S.E.2d 605
 
 , 607 (1986) (holding trial court failed to exercise its discretion in denying jury request to rehear testimony where the trial court told the jury, "[I]t is not possible to arrange that. ... I'm sorry that there is no way I can accommodate that request.").
 

 In the present case, the trial court failed to exercise its discretion to grant or deny a request by the jury to review witness testimony. Contrary to the State's contention that the trial court merely made it "clear [to the jurors] that if they asked him for his interpretation [of witness testimony]," the judge would instruct them to "make that determination based on [their own] recollection[s]," the court did not inform the jury it would refuse to
 
 interpret the meaning
 
 of any particular testimony or "recapitulate the facts" of the case. Rather, the court made comments prior to closing arguments that suggested it would be futile for the jury to request to review witness testimony whatsoever:
 

 When you go back and start deliberating, if six of you say, Well, I remember this witness says things this way and the other six of you say, No, I don't remember it that way ... you don't have the option of saying, Well, let's go ask the judge and let the judge tell us what did that witness really say. Because if you ask that question, my response it going to be, That's part of your job, to figure it out and to make that determination based on your recollection[.]
 

 Although the trial court's surrounding comments may have emphasized the jury's fact-finding role, its unequivocal statement that jurors "[
 
 would not
 
 ]
 
 have the option
 
 ," during deliberations, to ask the court "what ...
 

 *707
 
 [a] witness really [said]" suggested the court lacked the ability to even consider such a request. This was error.
 
 See
 

 State v. Long
 
 ,
 
 196 N.C.App. 22
 
 , 40,
 
 674 S.E.2d 696
 
 , 706 (2009) (citing "cases in which our courts have concluded that although the trial court admonished the jury to rely upon their recollections, the trial court did not exercise its discretion because of accompanying language which indicated the trial court did not believe it had the discretion to grant the request." (citation and internal quotation marks omitted));
 
 see also
 

 Johnson
 
 ,
 
 164 N.C.App. at 20
 
 ,
 
 595 S.E.2d at 187
 
 ("While [§ 1233(a) ] refers solely to requests made by the jury for review of certain testimony or evidence, we nonetheless find that the purpose and intent of the statute are violated ... [where] the trial court's pretrial comments
 
 could have foreclosed
 
 the jury from making a request for such testimony or evidence. Thus, we find error even without a request by the jury." (emphasis added)).
 

 2.
 
 Prejudicial Error
 

 Even when a trial court fails to exercise its discretion to grant or deny a jury's request to review evidence, a defendant must demonstrate he was prejudiced by the trial court's failure to exercise discretion.
 
 See
 
 N.C.G.S. § 15A-1443(a) (providing in part that "[t]he burden of showing ... prejudice ... is upon the defendant."). This Court has held it is not necessarily prejudicial error to preemptively deny a jury an opportunity to request to review witness testimony even where "a [defendant's] conviction hinges in large part on the credibility of an alleged accomplice who testifies at trial[.]"
 
 Johnson
 
 ,
 
 164 N.C.App. at 20
 
 ,
 
 595 S.E.2d at 187
 
 . The defendant must show that certain testimony involved issues of some confusion and contradiction such that it is likely a jury would want to review the testimony.
 
 See
 
 id.
 

 (citation and internal quotation marks omitted).
 

 This Court has also distinguished "cases where
 
 material
 
 evidence was requested [by the jury], [as opposed to] cases where the evidence requested was
 
 not determinative of guilt or innocence
 
 ."
 
 Long
 
 ,
 
 196 N.C.App. at 40
 
 ,
 
 674 S.E.2d at 707
 
 (citations omitted) (emphases
 
 *763
 
 added). We thus consider whether, in the present case, Defendant has identified specific witness testimony involving issues of such confusion and contradiction that the jury would have likely wanted to review it or that was material to the determination of Defendant's guilt or innocence. We conclude he has not.
 

 Defendant alleges he was prejudiced by the trial court's failure to exercise its discretion because "[t]he only evidence linking [Defendant] to the homicide" came from four accomplice witnesses who "gave
 
 *708
 
 conflicting testimony about [1] the alleged plan to commit a robbery and how and when it developed[;] ... [2] the details of what happened during the robbery attempt[;] ... [3] what Defendant ... allegedly said during the drive to Gastonia[;] and ... [4] what allegedly happened at the apartment of [Adams] in Gastonia." As Defendant bears the burden of showing prejudice, we limit our review to the specific areas of purportedly "conflicting [witness] testimony" Defendant identifies. We address each in turn.
 

 a.
 
 The alleged plan to commit a robbery
 

 Defendant first contends that Roberts, Schenck, and Edwards "gave contradictory testimony about the alleged discussions prior to the homicide concerning the plan to rob [Munufie after] lur[ing him] to the scene by [Roberts] through the chat line connection[.]" Beyond this general assertion, Defendant does not point to any specific testimony by the individual witnesses which he characterizes as "conflicting" on this subject. Our review of the record indicates that, in fact, the accomplice witnesses gave largely consistent accounts of the planning stage leading up to the attempted robbery. For example, Roberts, Schenck, and Edwards all testified that, while they were at Frederick's house, Roberts was talking on the chat line in order to select a person to rob. Roberts, Schenck, and Edwards all testified the original plan was to lure Munufie to a hotel, but after group discussion, they settled on 206 Putnam Place. It was undisputed that Roberts gave Munufie driving directions to Kings Mountain and later to Putnam Place specifically. Roberts testified that, after picking up Thompson in Ebenezer, the plan that emerged
 

 was for [Roberts] to go get in [Munufie's] car. [Edwards] was going to wait ... in the Camry.... [Defendant, Schenck, and Thompson] were supposed to hide in the bushes [behind 206 Putnam Place], come up to the [Cadillac], scare [Munufie] and only rob him, and we [were] all supposed to go back to [the Camry] and leave.
 

 Roberts testified she could not recall whether there was any discussion of who would actually take Munufie's money. Schenck also testified that the plan was for Roberts to get in the Cadillac, but that Defendant was supposed to "get the money ... with a gun." However, both Roberts and Schenck testified they did not see Defendant with a gun during the planning stage. Edwards testified that "[t]he plan was that [Munufie would] come down [to Kings Mountain] and [Roberts] was going to get in the car with him and then he was going to get robbed, I guess." We are unable to discern any material contradictions among the accomplice witnesses'
 

 *709
 
 testimony on this issue, and Defendant has not pointed to any specific conflicts in support of his argument.
 

 b.
 
 The details of what happened during the robbery attempt
 

 Defendant next argues the accomplice witnesses "gave conflicting testimony about the details of what happened during the robbery attempt." Specifically, Defendant contends that "[t]he testimony of [Schenck] and [Roberts] that [Defendant] was seen holding a gun when he allegedly encountered ... Munufie at the driver's side door of [the] Cadillac was both confusing and contradicted." Defendant offers two reasons why the testimony of Schenck and Roberts on this point was "confusing and contradicted." First, Defendant maintains the evidence showed that during the attempted robbery, Defendant "was wearing loose-waisted pajama pants, the kind of clothing ... unlikely to provide a means for holding and concealing a ... firearm." Second, Defendant notes that, while Schenck and Roberts both testified Defendant touched the driver's side door handle of Munufie's Cadillac, Defendant's DNA was
 
 *764
 
 not discovered anywhere on the vehicle's exterior.
 

 The factual details Defendant identifies did not contradict the testimony of Schenck and Roberts about their own observations of Defendant holding a gun during the robbery attempt. Although Schenck testified Defendant was wearing "pajama pants" during the attempted robbery, he did not testify they were "loose-waisted." Schenck also did not testify that he saw Defendant pull the gun from his waistband; he testified only that, by the time Defendant approached the driver's side door of the Cadillac, "[Defendant] had pulled out a gun[.]" Roberts testified that, when she got out of the Cadillac the first time and went to the back of the house to ask Defendant what was taking so long, she did not see Defendant with a gun. Roberts then returned to the Cadillac, with her back to Defendant as he approached the driver's side door, and testified she could only see "shadows out of [her] peripheral view." Like Schenck, Roberts testified that Defendant "knocked on the [driver's side] window with a gun." Roberts testified she did not actually see a gun in Defendant's possession "[until] he knocked on the window with the gun." Neither witness testified about when or how Defendant obtained the gun; where he concealed it on his person, if at all; or when he first pulled out the gun.
 

 Roberts and Schenck both testified Defendant tried to open the driver's side door of Munufie's Cadillac. Thus, the State offered consistent testimony on this issue from multiple eyewitnesses to the actual robbery attempt, and Defendant did not offer contradictory testimony.
 

 *710
 

 Cf.
 

 Hatfield
 
 ,
 
 225 N.C.App. at 773
 
 ,
 
 738 S.E.2d at 241
 
 (holding trial court's failure to exercise its discretion under N.C.G.S. § 15A-1233(a) was prejudicial where requested testimony was that of the sole eyewitness to the defendant's alleged crimes, and defendant directly contradicted the witness's testimony at trial.). The jury heard expert testimony regarding the lack of Defendant's DNA on Munufie's Cadillac, against which it could weigh the testimony of Roberts and Schenck that Defendant in fact touched the Cadillac's door handle. Defendant has failed to show some confusion or contradiction that would make it likely that the jury would have wanted to review the testimony of Roberts or Schenck on this issue.
 

 c.
 
 Defendant's alleged statements during the drive to Gastonia
 

 Defendant next contends that Roberts, Schenck, and Edwards "gave contradictory testimony about the statements allegedly made by [Defendant] during the drive to Gastonia after the homicide." Once again, Defendant does not direct us to specific testimony by the individual witnesses.
 

 Thompson testified that, during the car ride to Gastonia, "[n]obody said anything." Thompson was the only accomplice witness to deny ever having gone to 206 Putnam Place on 13 March 2012. He also testified he had a "bad memory" and remembered very little about the night of the attempted robbery or the days that followed. However, Roberts, Schenck, and Edwards all testified about statements Defendant made during the drive. The statements attributed to Defendant by these witnesses, although not identical, were not inconsistent. Roberts testified she "was ... crying really bad and [asking Defendant], 'What happened? What happened?' ... [and after a couple of minutes Defendant] just said, 'I'm sorry.' " Roberts also testified that she said, "Damn, we're going to get in trouble," and that Defendant replied, "No, we ain't." According to Schenck, Roberts
 

 kept asking [Defendant] why-"Did you shoot him? Why did you shoot him? How many times did you shoot him?" [Defendant] wasn't really saying nothing [sic] [at first]. ... And while we [were] driving [Roberts] just kept asking [Defendant] like, "Why did you do it?" And [Defendant] was just like, "I had to do it."
 

 Edwards testified that, during the drive to Gastonia, "[e]verybody was frantic. [Roberts] was like, 'What happened? What happened? Did you kill him? And [Defendant] said, 'I don't know. I shot him in the face.' ... [Defendant] said, 'I'm sorry. I'm sorry.' "
 

 *711
 
 This testimony from Roberts, Schenck, and Edwards about Defendant's alleged statements during the drive to Gastonia was mutually reinforcing, not mutually exclusive.
 

 *765
 
 Each witness described a similar sequence of events: Roberts pressing Defendant to explain what happened; Defendant's initial silence; and an eventual statement by Defendant suggesting some level of culpability. Defendant has not shown any direct contradictions among the witness accounts. Further, as the State presented testimony from multiple eyewitnesses to the actual robbery attempt, the statements Defendant allegedly made after the fact were not material to the determination of defendant's guilt or innocence.
 

 d.
 
 What allegedly happened at Adams's apartment in Gastonia
 

 Finally, Defendant contends he was prejudiced by the trial court's error because the accomplice witnesses "gave conflicting testimony about what allegedly happened at the apartment of Angelica Adams in Gastonia." Defendant makes this assertion generally but, in arguing prejudice, does not point to specific examples of "conflicting [witness] testimony" about what transpired at Adams's apartment. We find nothing in the relevant witness testimony on this topic that was either material to a determination of Defendant's guilt or innocence or involved issues of such confusion or contradiction that the jury would likely have needed to review the testimony in order to understand it.
 

 Adams and the four accomplice witnesses testified about what happened while they were at the apartment, and certain details differed among the witnesses. Schenck, Edwards, and Thompson all testified that, at some point while they were at Adams's apartment, Defendant and the four accomplices went outside and talked. Schenck and Edwards testified that while they were outside, they discussed possible alibis. Thompson testified that they didn't "talk[ ] about too much of [anything]" while outside the apartment. Adams testified that, "[a]s far as [she could] remember," the group remained in her apartment for their entire visit and the only person who left her presence was Defendant, who used a bathroom in the apartment. Roberts testified that the group was only at the apartment for approximately ten minutes before Adams drove Schenck, Edwards, and Thompson home; Edwards testified the group stayed for approximately one hour; and Adams testified the group stayed for several hours.
 

 Roberts was the only one of the four accomplice witnesses who testified Defendant used the bathroom at Adams's apartment. Roberts was also the only witness to testify that Defendant asked Adams for some
 
 *712
 
 cleaning products before going into the bathroom. Adams testified that Defendant used her bathroom, and that when she returned home later she found "dirt, [and] black stuff all over [the bathroom] sink." Adams and all four accomplice witnesses testified consistently that, at some point, Adams drove Schenck, Edwards, and Thompson home, leaving Roberts and Defendant alone together. No witness testified he or she saw Defendant with a gun while the group was together inside or outside Adams's apartment. Thus, there was no "conflicting" witness testimony on any of these issues.
 

 Roberts testified that, after the others left, she and Defendant sat in the Camry talking for approximately twenty minutes. According to Roberts, she again asked Defendant what happened during the attempted robbery, and Defendant replied, "Sorry, I had to." Roberts testified that, while they were still sitting in the car, she saw Defendant wrap a gun in a t-shirt and then go "hide it up under the [apartment] stairs." Although Roberts was the only eyewitness to testify about Defendant hiding a gun at Adams's apartment after the attempted robbery, Defendant was not prejudiced by the jury's lack of opportunity to review that specific testimony.
 

 Roberts's testimony was corroborated by several investigating officers who testified at trial. Det. Woosley testified Roberts told investigating officers they might find the gun at Adams's apartment on 20 March 2012.
 
 [3]
 
 Det. Woosley testified she relayed that information to other CCSO officers who then
 
 *766
 
 acted upon it. CCSO Lieutenant Mark Craig ("Lt. Craig") testified he went to Adams's apartment on 20 March 2012 "[t]o look for a yellow shirt and a gun ... [after] receiv[ing] a call from [his CCSO] captain[.]" CCSO Officer John Kaiser ("Officer Kaiser") testified he was with Lt. Craig on 20 March 2012 when Lt. Craig received a call indicating they should search Adams's apartment. Officer Kaiser testified they "were looking for a yellow cloth or [t]-shirt. And the information we had was that there would be a gun inside this yellow cloth or [t]-shirt. That's what we were looking for." Upon arriving at Adams's apartment complex, Lt. Craig immediately "noticed something yellow under a staircase. And I was there to retrieve something yellow and ... thought surely it couldn't be this easy." Taken together, these officers' testimony established that, based on information received from Roberts, CCSO officers found a gun
 
 *713
 
 at Adams's apartment wrapped in a yellow t-shirt and placed beneath a staircase, consistent with Roberts's eyewitness testimony.
 

 Additionally, Roberts's testimony about Defendant hiding a gun at Adams's apartment was not the only evidence linking Defendant to the
 
 crime of attempted robbery
 
 .
 
 Cf.
 

 Hatfield
 
 ,
 
 225 N.C.App. at 772
 
 ,
 
 738 S.E.2d at 241
 
 ("Our Supreme Court has previously held that a jury is likely to want to review testimony that is the only evidence directly linking [a] defendant to the alleged crimes." (citation and internal quotation marks omitted)). Instead, Roberts's testimony was the only evidence linking Defendant to the subsequent possession of a gun possibly used in the robbery attempt. Both Schenck and Roberts testified they saw Defendant committing the attempted robbery.
 
 Cf.
 

 Thompkins
 
 ,
 
 83 N.C.App. at 46
 
 ,
 
 348 S.E.2d at 607
 
 (finding trial court's failure to exercise its discretion was prejudicial where "[t]he jury requested a review of the testimony of ... the only witness to identify defendant as the perpetrator. Whether the jury fully understood [that witness's] testimony was material to the determination of defendant's guilt or innocence.") Accordingly, we cannot conclude Roberts's testimony about Defendant hiding a gun at the apartment complex was "determinative of [Defendant's] guilt or innocence."
 
 See
 

 Long
 
 ,
 
 196 N.C.App. at 40
 
 ,
 
 674 S.E.2d at 707
 
 .
 

 Defendant has failed to identify any particular testimony by the accomplice witnesses which, if reviewed by the jury, suggests "a reasonable possibility ... [of] a different result ... at [Defendant's] trial[.]"
 
 See
 
 N.C.G.S. § 15A-1443(a). Accordingly, we find Defendant received a trial free from prejudicial error.
 

 NO PREJUDICIAL ERROR.
 

 Judges STROUD and INMAN concur.
 

 [1]
 

 Crime scene investigators observed three spent shell casings on the night of the murder before Munufie's body was removed from the scene. A fourth cartridge was found by a detective upon returning to 206 Putnam Place around 4:00 p.m. the next day.
 

 [2]
 

 During the charge conference, following an argument by defense counsel that the robbery was incomplete, the trial court dismissed the charge of robbery with a dangerous weapon and replaced it with attempted robbery.
 

 [3]
 

 The jury also heard an audio recording of portions of Roberts's 20 March 2012 interview with Det. Woosley and CCSO Detective Amy Stroupe. The State offered the recording into evidence as a prior consistent statement, and the trial court received it "for the purposes [sic] of corroboration and only for that purpose."