HUNTER, JR., Robert N., Judge.
Armond Devega ("Defendant") appeals following jury verdicts convicting him of first-degree murder, attempted murder, and six counts of armed robbery. Following the verdicts, the trial court sentenced Defendant to life imprisonment without the possibility of parole for the first-degree murder conviction and 220 to 273 months imprisonment for the attempted murder conviction. The court arrested judgment on two of the armed robbery convictions and sentenced Defendant to consecutive terms of 117 to 150 months imprisonment for each of the four remaining armed robbery convictions. On appeal, Defendant contends the trial court abused its discretion in three ways: (1) by allowing the State to enter into evidence surveillance video from the Trawick Road murder scene; (2) by allowing testimony regarding the keyword search of Defendant's computer; and (3) by denying the jury's request to review a transcript during deliberations. Defendant also contends the trial court erred in denying his motion to dismiss for insufficient evidence. We find no error.
I. Factual and Procedural History
On 17 November 2008, a Wake County Grand Jury indicted Defendant for two counts of first-degree murder, one count of attempted first-degree murder, and nine counts of robbery with a dangerous weapon. After considering several pre-trial motions, the Wake County Superior Court called Defendant's case for trial on 24 February 2014. The State called over ninety witnesses. The following evidence is relevant to the issues raised on appeal.[1]
A. Durant Road Subway Robbery
The State called Lauren Wheeler, the manager of a Subway restaurant on Durant Road. On 23 January 2008, at approximately 8:30 p.m., a man, who she later identified as Defendant, entered the store and asked Wheeler for a job application. At that time, Wheeler stood near the cash register while her co-worker, Brandi McGohan, emptied the trash. No other customers were in the store. As Wheeler reached under the counter for the job application, the man walked behind the counter through the swinging doors to where Wheeler stood. He pointed a gun at her. Wheeler asked whether he was joking, and he replied, "No, I'm very serious." The man then forced her to walk toward the back of the store. He ordered McGohan, who had just returned from outside, to get into the freezer. Wheeler and Defendant walked back to the front of the store, toward the cash register. Defendant asked her several times if she knew how to open the safe and she repeatedly told him no. Wheeler opened the cash register and gave him all of the cash there, as well as a box of coins, then he left the store. As soon as he left, Wheeler ran to lock the door, called the police, and let McGohan out of the freezer.
Wheeler estimated the robbery lasted approximately fifteen minutes. She described the suspect as wearing a green jacket, a hat, sunglasses, and black boots. He held a western gun with a long, black barrel. Wheeler saw the suspect's face a lot, and she described him as having very distinctive features including his nose and facial hair.
When asked by the prosecution to identify the man who robbed her, she identified Defendant. She stated she was one hundred percent sure Defendant committed the crime. On cross-examination, Wheeler indicated sometime in 2009 or 2010, she viewed a picture of Defendant online, in conjunction with a news story which indicated Defendant had been arrested and charged with the robbery of the Durant Road Subway.
The State called McGohan, Wheeler's co-worker. The night of the incident, when McGohan returned from taking out the trash, she saw Defendant standing behind Wheeler, holding a gun to her head. Defendant then grabbed McGohan by the collar and told Wheeler to put her in the freezer. Defendant shut the door of the freezer, but seconds later returned and told McGohan to give him her cell phone. He threatened to kill her if she came out. She confirmed he wore a hooded sweatshirt and sunglasses. She only viewed Defendant for a few seconds, and, therefore, could not provide a detailed description of him. However, she did describe his cheeks as "baby face smooth."
When police officers arrived on the scene, Wheeler gave a statement and described the assailant as a black male, approximately six feet one inch tall, and two hundred pounds. He wore a green jacket, blue jeans, Timberland boots, sunglasses, and a black skull cap, and he had a goatee. She described the gun as a western gun with a black and brown handle.[2] Another detective interviewed the owner of the restaurant, Mr. Patel. Patel viewed the surveillance videos and stated the suspect resembled a former employee.
B. Louisburg Road WilcoHess Robbery
The State called Sabbir Pavel, the store manager of the WilcoHess on Louisburg Road. On 1 February 2008, around 5:00 a.m., Pavel arrived to open the store for business. While approaching the front door, he heard someone say "hold up." He then saw a man with a gun. The man put the gun to Pavel's back and held him by the jacket. He told Pavel to open the door and he walked him to the alarm keypad to turn off the alarm. He asked Pavel where the safe was. Pavel pointed to it, and the suspect ordered him to lay down on the floor and open the safe. Pavel said he did not have a key to the safe. Then the suspect pressed a knife against Pavel's neck and said "you're a manager, you have the key." Pavel used his key to open the safe, and the suspect told him to put money in a bag.
The suspect ordered Pavel to get up, and he took Pavel to the back office. The suspect told Pavel to give him the cordless office phone and his cell phone. The suspect threw both phones on the floor, breaking the cordless phone. Then he commanded Pavel to stay behind the cash register and not to move. He left the store, and Pavel used the silent alarm to contact the police.
Pavel described the suspect as a black male, approximately six feet tall, and between 190 and 210 pounds, with a muscular build. He wore a mask made of pantyhose, a jacket, and gloves. He also held a short, silver handgun. The State then played the surveillance video for the jury, which showed the event Pavel described.
Two weeks later, on 13 February 2008, a second robbery occurred at the same store. This time, Pavel arrived to work at approximately 5:15 a.m., and as he entered the store and pulled the door closed, someone put a gun between the door to hold it open. The suspect then pushed Pavel and told him to turn off the alarm and open the safe. Pavel complied and gave the suspect money. Then the suspect fled. Pavel immediately recognized the robber as the same man who committed the first robbery. He also recognized the same gun. This time, the suspect wore a black jacket and covered his face and head with a mask. The State played the surveillance video for the jury, which reflected the event Pavel described.
The State called Raleigh Police Officer Daniel Shelton, who responded to the 1 February armed robbery. He spoke with Pavel and obtained a description of the assailant. Pavel described the suspect as "wearing [an] olive drab color coat, dark blue jeans, black gloves and a light see-through beige mask similar to pantyhose." He also described the man as approximately 190 pounds, muscular, and twenty-seven to thirty-two years old.
The State called Officer J. D. Rattelade, who responded to the 13 February armed robbery. Pavel gave Officer Rattelade a description of the suspect, identifying him as "a black male, approximately 30 years of age, six foot, six foot two inches tall, medium build, wearing a red and gray ski mask, green coat, blue jeans, and gloves, and armed with a silver revolver." Pavel stated he arrived to open the store that morning and as he unlocked the front door to enter, he was "ambushed." The suspect pointed a silver revolver at him, ordered him to enter the store, and to turn off the alarm. Then, the suspect ordered him to open the safe. Pavel obeyed, and placed approximately three thousand dollars in a plastic bag. Pavel stated he was certain the same man committed both robberies. Investigators did not test the scene for fingerprints.
C. Trawick Road WilcoHess Murder
The State called Officer E. M. Vigeant. On 10 April 2008, at approximately 5:00 a.m., he responded to an armed robbery at the WilcoHess on Trawick Road. As he approached the store, a man hurried toward him stating his fiancé inside the store needed help. The man said his fiancé, Ms. Anderson, opened the store every day, and he also went to the store daily to get a newspaper. However, on this day when he arrived, he saw Anderson lying on the floor, so he called 911.
The officer went to Anderson and found her breathing, but unresponsive. Moments later, she stopped breathing, and emergency medical responders pronounced her dead.[3]
The State called Agent Michael Galloway, who responded to the scene, reviewed the surveillance footage, and collected fingerprints and footwear impressions. The State moved to enter the surveillance video into evidence, and Defendant objected. The court overruled the objection, on the basis the probative value of the evidence outweighed any prejudicial effect to Defendant. Defendant also requested the court mute the sound, and the court denied this motion.
The State called Sergeant Michael Galloway, who also responded to the scene and reviewed the surveillance video.[4] From the surveillance footage, Sergeant Galloway observed the following:
Upon [Anderson's] arrival, I observed the victim approaching the front door. She arrives at the front door and prepares to unlock it. The suspect is observed running towards the victim with a handgun displayed. Upon reaching the victim, the suspect orders her at gun point to unlock the door. Once inside the business, the suspect instructs the victim to deactivate the burglar alarm. After disarming the alarm, the suspect orders the victim to get on her knees. He also instructs her to open the safe. She obeys the suspect's initial demand by going to a kneeling position behind the counter. The ... suspect demands for the victim to open the safe again and again.
....
The victim appears as if she attempts to unlock the safe. However she's unsuccessful. The suspect starts to count. He says[,] "One[.]"
....
The victim pleads with the suspect to no avail. The suspect says, "Two."
Then, after the suspect shot the victim, he fled the scene on foot. Based on the footage, Sergeant Galloway, along with other detectives and investigators, created the following description of the suspect:
[A] [b]lack male, 18 to 25 years of age, 5 foot 10 to six foot, light to medium complexion, wearing [a] navy blue hooded sweatshirt jacket, camouflage shirt underneath, dark baggy jeans, black sneakers, possibly Air Force Ones, and a camouflage cap. White synthetic gloves with blue rubber palms and tips, writing on [the] back of [the] gloves. Analog wrist watch on left arm, dark colored band and possibly a green face. Armed with a dark-colored revolver with a wood color handle, possibl[y] a .38 caliber, with four to six inch barrel.
At the time the investigators devised the description, they immediately noted similarities in the 23 January Subway robbery, and the 1 and 13 February WilcoHess robberies. The investigators also recognized similarities in the firearm used in each incident. Agent Galloway testified, "it very quickly became apparent that these robbery cases were related to the WilcoHess on Trawick Road...."
D. Six Forks Road Subway Robbery
The State called Nisrin Mohammed, an employee at the Subway restaurant on Six Forks Road. On 7 May 2008, between 7:00 and 7:30 p.m., a man entered the restaurant wearing a strange hat and glasses. Mohammed immediately felt uncomfortable and thought something was wrong. When his co-worker, Sihem Benamara, entered the store, Mohammed pretended to wash his hands and discretely told Benamara to call the police.
The suspect ordered a sandwich, and Mohammed took his time making it. The suspect paid, then sat at a table and ate. Another customer entered the restaurant, ordered, and then left. Mohammed saw her leave and noticed the parking lot was then empty. The suspect approached Mohammed a second time, ordered another sandwich, and asked if he could use the restroom. Mohammed told him he could and prepared the sandwich.
The suspect walked down the hallway toward the restroom, but instead of entering the restroom, he attempted to open the door to the employees' office. He then returned to the front of the store and stood in front of Mohammed. A moment later, the suspect quickly ran and jumped over the counter, toward the cash register and grabbed Benamara. He held a small, black gun in his hand. He loudly and repeatedly told Benamara, "[g]ive me the money."
Mohammed put the money from the cash register in a Subway bag. The suspect also demanded all the money in Benamara's purse. He repeatedly asked Mohammed to open the safe, and Mohammed responded he did not have the key. The suspect pushed Benamara to the back of the store, grabbed Mohammed, and repeated "I need money, money." Benamara escaped through the back door of the store, and the suspect fired his gun at Mohammed, missing. The bullet entered the wall near the back door. Mohammed opened the back door and pushed the suspect outside. The surveillance camera was not recording that night.[5]
Mohammed described the suspect as average size, dark skinned, and approximately 167 to 168 centimeters tall. He appeared to be twenty-seven or twenty-eight years old, and he had a big mouth and big lips. He wore a "weird" hat and "multi-colored children's sunglasses."
The State called Raleigh Police Officer A. G. Wimberly, who responded to the armed robbery. He interviewed Benamara, who described the suspect as "a black male, 26 years old, no facial hair, approximately five-eleven, medium build, wearing a brown boonie hat, a black shirt, and blue jeans." He also wore black, children's sunglasses, and had a black and brown handgun. Officer Wimberly understood the term "boonie hat" to mean "something an individual in the military would wear to protect themselves ... from the elements. It commonly has a strap." The two victims later described the hat as a "fishing-style hat." Investigators recovered fingerprints, shoe prints, and bullet fragments from the scene.
The State called Sergeant Brian Hall, who also responded to the scene. Sergeant Hall interviewed Benamara, who said she saw the robbery occur through a closed circuit television in the back area of the store, where she was washing dishes. Her description of the robbery corroborated Mohammed's testimony.
The suspect told Benamara to give him money from her purse, and she complied. He continued to demand more, saying "[g]ive me more money. Give me more money." When Benamara managed to escape his grasp, she heard a gunshot and smelled gun powder. She stated the suspect looked similar to someone she had seen in the restaurant a few weeks prior. She gave the following description of the suspect:
[A] black male between the ages of 23 and 24, about 5 foot 11 in height, a medium build, medium skin tone. He had a wide nose and big lips. He wore a black and brown colored hat that she described as like a beach hat and the design was wavy and varied in color between a black and brown color, but she indicated that [it] was not a camouflage pattern. He also wore small children's or kid's sunglasses which were narrow in the frame and lens and they were all black in color. He was clean shaven. He wore a black long-sleeved shirt with no lettering or patterns and wore medium-colored blue jeans which were baggy.
The State called Tracy Lipskoch, as an expert in latent examination of fingerprints. Lipskoch testified investigators obtained one fingerprint of value from the scene, and she compared it to Defendant's prints. Her first comparison was inconclusive, and her second comparison excluded Defendant as the source of the prints.
E. Mexico Lindo Robbery and Attempted Murder
The State called Modesta Fernandez-Lucas, an employee at the Mexico Lindo check-cashing business on Wake Forest Road. On 10 September 2008, around 8:15 p.m., Fernandez-Lucas and her co-worker, Alba Acosta, were preparing to close the store, when she noticed a man walking back and forth on the sidewalk by the door. A few minutes passed, then the man quickly entered the store holding a small, black gun. Fernandez-Lucas pushed the silent alarm and grabbed the gun she kept near the counter. The suspect jumped over the counter toward her, screamed, and shot her in the hands and arm. Fernandez-Lucas attempted to hide under the counter, but the suspect kicked and hit her until she pretended to be dead. Then he took money out of the cash registers. Moments later, Acosta came to her aid and called 911.[6]
When police officers arrived at the scene, Fernandez-Lucas gave a description of the suspect. At the time she could only remember he wore a mask and something covered his head. Later, medical responders transferred Fernandez-Lucas to the hospital. The State showed the surveillance video to the jury.
The State called Officer V. J. Espinoza, who responded to the Mexico Lindo robbery and took Acosta's statement. Acosta stated she heard someone enter the store and then heard Fernandez-Lucas yell. She saw a man pointing a black gun at Fernandez-Lucas and walking quickly toward her. Then the man jumped over the counter and shot at Fernandez-Lucas approximately four times. Acosta estimated the suspect stayed in the store for approximately four or five minutes. She described the suspect as a tall, black male, approximately six feet tall and 180 pounds. He wore a black ski mask, a camouflage jacket and pants, gloves, black boots, and a black gun, which Acosta thought might be a revolver.
The State called Detective Zamora, who assisted in the investigation and interviewed Fernandez-Lucas in the hospital. Fernandez-Lucas's statement to Zamora corroborated her testimony. She also described the suspect as a slim, black male, approximately six feet tall. He wore a puffy, camouflaged jacket with a hood and black gloves. She believed the suspect had a black semi-automatic pistol in his right hand, and she did not remember any details about his face.
Officer Greg Palczak responded to the scene and took statements from both clerks. Officers did not recover any shell casings from the scene, indicating the suspect used a revolver. Palczak did recover a spent bullet, and this, along with the fragments left in Fernandez-Lucas's hand, were linked to the Anderson homicide and the Six Forks Road Subway robbery.
F. Investigations
The State called Taneka Sharperson, who dated Defendant for approximately six months during 2007. During that time, Defendant worked as an assistant electrician at Pike Electric. He regularly wore dark protective eyewear and gloves to work. His gloves were white with a blue palm. Sharperson stated Defendant owns a dark brown and black revolver. She also testified Defendant has a speech impediment, which causes him to stutter significantly, especially when he is upset or anxious.
In September 2008, Sharperson saw news footage on television indicating someone robbed the WilcoHess on Trawick Road and murdered the clerk. Sharperson recognized the photograph of the suspect as Defendant. She then drove to the WilcoHess, which was located less than five minutes from her house. She had previously seen a poster of the suspect on the store's front door. Sharperson obtained the hotline number from the poster and called the police. When she called, she gave the detective a false name. She told the detective the photo looked like Defendant, because "he has very distinct features." She also indicated the glasses Defendant wore to work matched the glasses in the picture.
In early September, Sharperson met with Detective Galloway to view additional surveillance photographs and videos. After viewing the surveillance videos of the WilcoHess homicide, she identified the suspect's voice as Defendant's and recognized his stuttering.
In surveillance photographs of the Mexico Lindo robbery, she recognized the suspect's camouflage rain suit and the gloves as similar to ones Defendant wore to work. She also recognized Defendant's eyes in the photographs and stated, "I just knew his eyes. They're very, ... distinct."
In other surveillance photographs, she recognized the suspect's Gore-Tex boots, LRG brand of blue jeans, and gray thermal shirt as similar to Defendant's clothing. She stated, "I have actually seen him in that complete outfit before." She also recognized the suspect's gloves as similar to Defendant's, as well as a green army-style jacket, which Defendant kept in her closet. She noted Defendant's distinctive nose, which she described as shaped like a bell pepper. She told officers Defendant frequently talked about ways to commit crimes without getting caught and was always "scheming and plotting" how to get away with things. He told her one way to avoid getting caught was to always act alone.
Sharperson admitted when she initially called the hotline, she knew the detectives offered a reward for information leading to the arrest and conviction of the person involved. For the information she provided, the detectives awarded her $12,500 and would give her another $12,500 upon Defendant's conviction. Sharperson also admitted she had previously accused Defendant of setting her car on fire. However, an investigation later determined an air-conditioner malfunction caused the car to catch on fire.
The State called Detective Marcus Smith, who investigated the WilcoHess robberies and the Durant Road Subway robbery. Smith determined in each of the robberies, the victims gave similar descriptions of the suspect, the suspect used a similar weapon, and both occurred in the same part of town. The Subway robbery occurred at 8:45 p.m. and both WilcoHess robberies around 5:00 a.m. All three robberies occurred when an employee appeared to be by themselves-either near the opening or closing of the business.
Sergeant Michael Galloway testified strong indicators linked the Anderson homicide to the Durant Road Subway robbery and both Louisburg Road WilcoHess robberies. In the Durant Road robbery and the Louisburg Road robberies, the suspect wore brown or dark-colored gloves. And in those same three robberies, the suspect used a black revolver with a brown handle. In each of the WilcoHess robberies, the suspect forced the clerk inside when they were opening the store around 5:00 a.m., commanded the clerk to open the safe, and then fled the scene.
Investigators determined the same weapon fired projectiles in the Anderson homicide, the Six Forks Road Subway robbery, and the Mexico Lindo robbery. However, investigators never recovered the weapon used.
The State called Christina Shoopman, as an expert in forensic DNA analysis. She examined evidence in the Anderson case and the Six Forks Road Subway robbery. In both instances, Defendant's DNA did not match any DNA recovered from the scene.
The State called Joyce Petzka, as an expert in footwear impressions. She compared eight pairs of shoes recovered from Defendant's house to impressions obtained from the scenes. In the Anderson homicide, one of the impressions "had a very small element that corresponded to one of the elements in one of [Defendant's] shoes."
Petzka also examined footwear evidence from the Six Forks Road Subway robbery. She determined one of Defendant's shoes corresponded to an impression taken from the scene. She "determined that the outsole design, the size of the design and the general wear of that shoe corresponded to [Defendant's blue fabric Nike TN Air athletic shoe]." From the Mexico Lindo scene, she determined three footwear impressions corresponded in outsole design to Defendant's shoe; yet these impressions did not contain any unique or individual characteristics which would identify Defendant's shoe as having made the impression.
In the Anderson homicide investigation, investigators collected fifty-seven footwear impressions, and only one had an element which corresponded to Defendant's shoe. On cross-examination, Petzka stated she could not definitively say Defendant's shoe could have made any of the impressions because shoemakers use similar design elements in their shoes and the general wear pattern of the heel area and the ball of the foot are the most common wear patterns.
The State called Mark Sams, Defendant's supervisor at Pike Electric for approximately three years. Detectives met with Sams and showed him photographs of the suspect in the Mexico Lindo robbery. Sams recognized the suspect as Defendant, based on his eyes. Sams also recognized the gloves in the photograph and said they resembled the gloves Pike employees used.
Stanley Hicks, who worked on the same crew as Defendant also testified. He also met with detectives and viewed photographs of the suspect. Hicks "noticed a lot of similarities" to Defendant, particularly the suspect's eyes and clothing. Hicks testified the suspect's clothing looked similar to the manner Pike workers dress in the winter-with hooded sweatshirts and masks to stay warm. Hicks stated by wearing masks while working "you learn a person's eyes." He testified Defendant has a "lazy eye" which was distinguishable and resembled the suspect. He also noticed the facial features, including the suspect's nose and lips, resembled Defendant.
The State called Kenneth Register, who also worked on the same crew as Defendant. He testified he always rode to job sites with Defendant, and the two were good friends. On one occasion, Defendant showed Register his revolver. Detectives showed Register pictures of the suspect. Register recognized the suspect's eyes as similar to Defendant's, and he thought the suspect could be Defendant. He also recognized the mask shown in one photograph as similar to one another crew member had. He stated Defendant occasionally joked about robbing banks.
The State called Courtney Tremel-Last, as an expert in computer forensics. Tremel-Last completed a forensic examination of a computer which officers recovered from Defendant's bedroom. She performed keyword searches for several words related to the robberies.[7] She determined "there were several websites found in unallocated space [on Defendant's computer] that may pertain to robberies in this case." Several results included a local news website with surveillance photographs and news briefs from dates related to the robberies.[8] She also obtained ten homework assignments from Defendant's computer. None of these assignments were created or accessed on any of the dates of the incidents for which Defendant was convicted.
The State called Kevin Sneed, an investigator of financial crimes. He testified regarding Defendant's bank account, which indicated in 2008 he had been charged several fees for insufficient funds and over drafting.
The State called Denita Devega, Defendant's sister-in-law. In June 2008, she noticed a photograph in a convenience store of a person who was "wanted" for a crime. The photograph did not depict the suspect's face, but she noticed the suspect and Defendant had similar body-builds. After seeing the photograph, she called Defendant and asked whether he was involved in the crime. He laughed and said, "[t]hat's not me. I wouldn't do anything like that."
Later, when she spoke to a detective and viewed photographs of the suspect, she informed the detective Defendant wore Gore-Tex boots, which are a popular style of boots, similar to those in the photograph. She also told the detective she was not one hundred percent certain the suspect in the photograph was Defendant.
The State called Latina Burney, Defendant's former girlfriend. She also met with detectives and viewed photographs of the suspect. She noticed the suspect's eyes and clothing were similar to Defendant's. She specifically noted the Gore-Tex boots.
The State called Robert Reid. Reid hosted card games at his house, which Defendant regularly attended. A detective spoke with Reed and showed him pictures of the suspect, which Reid had previously seen on the internet. Reed told the detective he often sat across from Defendant playing cards and was familiar with Defendant's eyes, which looked like the suspect's eyes. He told the detective "[t]hat's his eyes," and "[a]nyone who knows him should be able to tell you that."
In executing the search warrant of Defendant's house, officers seized a pair of blue-tipped gloves. However, an officer noted the logo on the gloves appeared different from those in the surveillance footage of the robberies.
When a detective interviewed Defendant, he asked where Defendant was on 10 September, the night of the Mexico Lindo robbery. Defendant first responded he did not know. He then stated his mom and dad use his car to go to church on Wednesday nights, and he completes his online school assignments. He later stated he thought he went to Dick's Sporting Goods at Triangle Town Center on 10 September. Defendant's home is approximately 4.5 miles from the particular Dick's Sporting Goods, and the Mexico Lindo is approximately 4.5 miles from the store.
Then, when the detective asked Defendant whether it was raining outside that night, Defendant stated "I know what you can do. This was supposed to be at nine, right?" as he pointed to the picture of the Mexico Lindo robbery. "I used my debit card. Whatever time that was, you can check." Then he stated, "I bought me a bag."
The State called Roy Keith Saunders, an employee at Dick's Sporting Goods. Saunders traced a transaction to Defendant on 10 September 2008 at 9:17 p.m. Surveillance video indicated Defendant was only in the store for four or five minutes.
The State called Detective Zeke Morse. Morse testified each of the businesses which were robbed are located within nine miles from Defendant's house. And each of the crimes, which occurred at night, occurred on a Wednesday night. Detectives never recovered the revolver which was ballistically linked to several cases. Nor did they recover the blue tipped gloves, the keys taken from Anderson, or the green army jacket.
The State presented evidence regarding Defendant twice robbing a produce stand in December 1999, in Wilmington, North Carolina. In committing each robbery, Defendant wore a green army-style jacket and used a revolver.
Defendant moved to dismiss each charge for lack of sufficient evidence. The trial court dismissed the charge of armed robbery of the Capital Boulevard Subway, but denied Defendant's motions for the other charges. Defendant did not put on any evidence, and he renewed the motions to dismiss. The trial court again denied the motions.
On 19 May 2014, the jury returned verdicts of guilty of robbery with a firearm for the Durant Road Subway robbery, both robberies of the WilcoHess on Louisburg Road, the WilcoHess on Trawick Road, the Six Forks Road Subway, and the Mexico Lindo. The jury found Defendant guilty of the attempted murder of Fernandez-Lucas and guilty of first-degree murder of Anderson. The jury found Defendant not guilty of two additional robbery charges and one additional murder charge. The trial court sentenced Defendant to life imprisonment without the possibility of parole for the first-degree murder conviction and 220 to 273 months imprisonment for the attempted murder conviction. The court arrested judgment on two of the armed robbery convictions and sentenced Defendant to consecutive terms of 117 to 150 months imprisonment for each of the four remaining armed robbery convictions. Defendant gave written notice of appeal to this Court on 26 May 2014.
II. Analysis
On appeal, Defendant contends the trial court committed error in four respects. First, Defendant contends the trial court abused its discretion in allowing the State to admit the surveillance video from the Anderson murder scene. Second, Defendant contends the trial court abused its discretion in allowing testimony regarding the keyword search of Defendant's computer. Third, Defendant argues the trial court abused its discretion by denying the jury's request for a transcript of Petzka's testimony. Finally, Defendant contends the trial court erred in denying his motion to dismiss for lack of sufficient evidence. We address each contention in turn.
1. Admission of the Trawick Road WilcoHess Surveillance Video
In his first argument on appeal, Defendant contends the trial court abused its discretion in allowing the State to introduce the surveillance video from the Trawick Road WilcoHess murder scene. Defendant argues this evidence constitutes irrelevant and highly prejudicial victim impact evidence, the admission of which deprived Defendant of his constitutional right to due process and a fair trial. We disagree.
The surveillance video depicts Anderson lying motionless on the floor. Then vehicle lights appear outside and a car horn honks. Moments later, Hewitt, Anderson's fiancé, runs inside the store, repeatedly crying "baby, baby" and "please God, help me." He then sits on the floor with Anderson, saying "baby, please don't do this to me, please God.... What do I do? Jesus please ..." During the scene, the song "How do you talk to an angel" is played from the store's sound system.
At trial, Defendant objected to the admission of this video under North Carolina Rule of Evidence 403 on the basis it is not probative and would only arouse the passions of the jury. The trial court overruled the objection on the basis the probative value of the evidence outweighed any prejudicial effect. Defendant also requested the court mute the sound, and the court denied this motion.
"We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion." State v. Whaley, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." State v. Hennis, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).
Under the North Carolina Rules of Evidence "[a]ll relevant evidence is admissible,.... Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2017). However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2017). Unfair prejudice means having "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Mason, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986).
Victim impact evidence is evidence of "physical, psychological, or emotional injury suffered by the victim ..." or evidence of "any economic or property loss suffered by the victim ..." N.C. Gen. Stat. § 15A-833(a) (2017). "Victim impact evidence also includes evidence of the effect of the crime on the victim's family, including the psychological and financial effect." State v. Graham, 186 N.C. App. 182, 190, 650 S.E.2d 639, 645 (2007).
Victim impact evidence is generally relevant and admissible in sentencing, though its admissibility in sentencing "is limited by the requirement that the evidence not be so prejudicial it renders the proceeding fundamentally unfair." However, the effect of a crime on a victim's family often has no tendency to prove whether a particular defendant committed a particular criminal act against a particular victim; therefore victim impact evidence is usually irrelevant during the guilt-innocence phase of a trial and must be excluded.
However, victim impact evidence which tends to show the context or circumstances of the crime itself, even if it also shows the effect of the crime on the victim and his family, is an exception to the general rule, and such evidence is relevant and therefore admissible at the guilt-innocence phase, providing, of course, that it is not subject to one of the admissibility exceptions of Rule 402.
Graham, 186 N.C. App. at 190-91, 650 S.E.2d at 645-46 (footnote omitted) (citations omitted) (quoting State v. Allen, 360 N.C. 297, 310, 626 S.E.2d 271, 282 (2006) ). We conclude the surveillance video at issue in this case is an exception to the general rule. This evidence is relevant and shows the context and circumstances of the crime itself, even though it also contains victim impact evidence. The surveillance video depicts the location of Anderson's body behind the counter, evidence of her injuries, how Hewitt discovered her, and the timing of his discovery. Therefore, we determine the trial court did not abuse its discretion in admitting this evidence.
Defendant argues any relevant facts demonstrated through the video were also established through the State's witnesses. Even so, it was within the trial court's discretion to determine admission of this evidence was not so repetitive as to lack probative value.
2. Testimony Regarding the Keyword Search of Defendant's Computer
Defendant next argues the trial court abused its discretion in allowing Tremel-Last to testify concerning a keyword search of Defendant's computer. Defendant contends this testimony was confusing and misleading, lacked probative value, and was prejudicial.
The State contends Defendant did not preserve this issue for appellate review by objecting at trial. Under the North Carolina Rules of Appellate Procedure, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion." N.C. R. App. P. 10(a)(1). In State v. Hazelwood, this Court held the appellate rules did not require the defendant to renew his objection when he first objected when the witness was testifying, then "[t]he trial court excused the jury and engaged in a lengthy discussion with the parties. The trial court overruled [the defendant's] objection, the jury returned, and the trial resumed." 187 N.C. App. 94, 98, 652 S.E.2d 63, 66 (2007). We held "Defendant's prior objection was sufficiently contemporaneous with the challenged testimony to be considered 'timely' for purposes of the appellate rules." Id.
When the State called Tremel-Last as a witness, defense counsel stated "Your Honor, this is the matter that I think we need to be heard outside the presence of the jury before testimony." After questioning the witness on voir dire and outside the presence of the jury, Defense counsel argued before the court that the evidence was not relevant and was "inadmissible and prejudicial and violates his 6th and 14th [A]mendment right in the [C]onstitution." Although counsel never used the word "objection" we determine he preserved this issue for appellate review.
Regardless, admission of this evidence was not error, much less abuse of discretion. As stated above, "[a]ll relevant evidence is admissible,.... Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2015). However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403.
Defendant argues Tremel-Last's testimony was irrelevant and misleading as critical context and details were missing from her report. Defendant asserts the URLs the witness identified represent only a small fraction of the data recovered in the search. Furthermore, the witness indicated she could not provide information on the content of the websites, or dates and times information was accessed. She also indicated the URLs may not include the entire web address because "it's just bits and pieces of unallocated space." Defendant argues the limited probative value of the evidence was substantially outweighed by the danger of confusion and misleading the jury.
We determine the evidence obtained from Defendant's hard drive was relevant evidence. Although the data was far from thorough information, the keyword search did reveal content on Defendant's computer, which could be related to the crimes committed. Particularly relevant is the information contradicting Defendant's statement to officers that he accessed his online course work on the Wednesday nights when several robberies occurred. Tremel-Last's testimony indicated the only Wednesday night on which Defendant accessed his course work was on 24 May 2008, the night of the Capital Food Mart robbery.[9]
Additionally, the keywords Tremel-Last used in conducting the search were all related in some manner to the crimes. While not highly probative of Defendant's involvement in the crimes, the presence of this content on Defendant's computer is relevant and not outweighed by any prejudice to the Defendant. Any issues regarding the incomplete nature of the evidence or the lack of reliability could properly be addressed on cross-examination. Therefore, we determine the trial court did not abuse its discretion in allowing this testimony.
3. Jury's Request for a Transcript
Defendant next argues the trial court abused its discretion when it denied the jury's request for a transcript of Petzka's testimony. This testimony concerned Petzka's comparison of footwear impressions to Defendant's shoes.
"It is a well-established rule in North Carolina that the decision whether to grant or refuse a request by the jury for a restatement of the evidence after jury deliberations have begun lies within the discretion of the trial court." State v. Johnson, 346 N.C. 119, 124, 484 S.E.2d 372, 375 (1997). "A trial court's ruling in response to a request by the jury to review testimony or other evidence is a discretionary decision, ordinarily reviewable only for an abuse thereof." State v. Perez, 135 N.C. App. 543, 554, 522 S.E.2d 102, 110 (1999)appeal dismissed and disc. review denied, 351 N.C. 366, 543 S.E.2d 140 (2000). N.C. Gen. Stat. § 15A-1233(a) provides:
If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence. In his discretion the judge may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.
In State v. Harden, the trial court denied the jury's request to review the transcript of the testimony of two witnesses, one of which constituted one hundred and eighty pages of transcript, and the other one hundred and fifty-five pages. 344 N.C. 542, 562-63, 476 S.E.2d 658, 668-69 (1996). On appeal, our Supreme Court determined the trial court properly exercised its discretion in deciding not to permit the jury's request. Id. at 562-63, 476 S.E.2d at 668-69. The Supreme Court determined "[i]n light of this evidence, it is clear that the trial court had decided that justice would be better served if the jury deliberations were not delayed to produce the requested transcripts." Id. at 563, 476 S.E.2d at 669.
Here, it is likewise evident the trial court exercised its discretion in denying the jury's request. Before making a ruling, the trial court requested the court reporter to determine the length of the witness's testimony. The court stated "I don't want to get into a three-hour reading marathon." The court reporter indicated the transcript of the testimony was approximately one hundred and fifteen pages, which the court determined would take nearly five hours to read to the jury, including the time needed for breaks. The court allowed each party to be heard on the matter before ultimately denying the jury's request. Therefore, it is evident the trial court properly exercised its discretion in denying the jury's request.
Defendant cites State v. Lang and State v. Ashe for the proposition that it is reversible error for the trial court to deny a jury request to review a transcript when the testimony involved issues of confusion and contradiction such that the jury would likely want to review it. State v. Lang, 301 N.C. 508, 272 S.E.2d 123 (1980) ; State v. Ashe, 314 N.C. 28, 331 S.E.2d 652 (1985). However, this consideration is only relevant if this Court first determines the trial court erred in failing to exercise its discretion. Only then must we consider whether the error was prejudicial.
[A] trial court's error in failing to exercise its discretion in denying a jury's request to review testimony constitutes prejudicial error when the requested testimony (1) is "material to the determination of defendant's guilt or innocence"; and (2) involves "issues of some confusion or contradiction" such that the jury would want to review this evidence to fully understand it.
State v. Chapman, --- N.C. App. ----, ----, 781 S.E.2d 320, 327 (2016) (quoting State v. Johnson, 346 N.C. 119, 126, 484 S.E.2d 372, 377 (1997) ). In both Lang and Ashe, the trial court found prejudicial error only after it first determined the trial court did not exercise discretion in denying the jury's request. Lang, 301 N.C. at 511, 272 S.E.2d at 125 ; Ashe, 314 N.C. at 35, 331 S.E.2d at 657.
In Lang, the jury requested a witness's testimony to be read and the trial judge stated: "No sir, the transcript is not available to the jury.... [A]nd 12 of you people are expected, through your ability to hear and understand and to recall evidence, to establish what the testimony was." Lang, 301 N.C at 510-11, 272 S.E.2d at 125. And in Ashe, the court denied the jury's request stating, "[t]here is no transcript at this point. You and the other jurors will have to take your recollection of the evidence...." Ashe, 314 N.C. at 35, 331 S.E.2d at 656-57. In both cases, the Supreme Court determined the trial court did not exercise discretion in denying the request. Lang, 301 N.C. at 511, 272 S.E.2d at 125 ; Ashe, 314 N.C. at 35, 331 S.E.2d at 656-57. Only then did the Supreme Court consider whether the error was prejudicial. Lang, 301 N.C. at 511, 272 S.E.2d at 125 ; Ashe, 314 N.C. at 36-38, 331 S.E.2d at 657-58.
Because we determined the trial court properly exercised its discretion in denying the jury's request, we conclude the trial court did not err.
4. Motion to Dismiss for Insufficient Evidence
In his final argument, Defendant contends the trial court erred in denying his motion to dismiss all charges for lack of sufficient evidence. Specifically, Defendant argues the State presented insufficient evidence of Defendant's identity as the perpetrator. We disagree.
"This Court reviews the trial court's denial of a motion to dismiss de novo." State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980).
"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." State v. Rose, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), cert. denied, 515 U.S. 1135, 132 L.Ed. 2d 818 (1995).
Defendant asserts the State's evidence was insufficient to show he was the perpetrator. Particularly, Defendant argues no DNA, fingerprint, or ballistic evidence linked him to the crimes charged. The footwear impressions only indicated narrow instances of "correspondence" to his shoes, surveillance images were of poor quality, only one of twelve victims identified Defendant as the perpetrator-and she identified Defendant after viewing his mugshot on the internet, and in the courtroom. Defendant also highlights the unpersuasive testimony concerning the computer search, the lack of financial evidence linking Defendant to the crimes, and the personal animus of an ex-girlfriend whose testimony he argues should be discredited.
We determine the State presented sufficient evidence tending to prove Defendant was the perpetrator. The State offered evidence demonstrating the crimes were connected in several respects. Each of the crimes occurred in Raleigh's northeast quadrant, and in close vicinity to Defendant's home. Victims of the robberies and surveillance footage indicated the suspect in each crime was a black male of similar age, height, weight, and body build. In each robbery, the suspect acted alone and committed the robberies either in the early morning hours, before the store opened, or late in the evening, near closing time. And each of the robberies which occurred at night, occurred on a Wednesday night. Also, in each robbery the suspect used a revolver, and in three of the cases-the Anderson murder, the Six Forks Road Subway robbery, and the Mexico Lindo robbery-the bullets were linked to the same weapon.
The Durant Road Subway robbery occurred much like the Six Forks Road Subway robbery. Both occurred on a Wednesday night. And, in each incident, the robber conducted some type of "normal" business upon entering the store. In the Six Forks Road robbery, the suspect ordered and paid for a sandwich; and in the Durant Road Subway robbery, the suspect asked for a job application. In each, the suspect wore a head covering and sunglasses. And, in the Durant Road case, the victim testified she had ample time to view the suspect's face, noted his distinctive features, and was one hundred percent sure Defendant committed the crime. Her identification is relevant evidence which a reasonable mind could accept as adequate to support the conclusion Defendant committed the Durant Road robbery. And from the similarities in the cases, a reasonable person could also conclude Defendant committed the Six Forks Road robbery.
The Louisburg Road WilcoHess robbeies occurred much like the Trawick Road WilcoHess robbery and murder. In each, the suspect ambushed the employee while they were opening the store. And, in each, the suspect wore dark colored gloves, and used a dark colored revolver with a brown handle. Victim testimony and surveillance footage indicated similar descriptions of the suspect. Sharperson first contacted detectives upon viewing a surveillance photograph from the Trawick Road robbery, in which she noted Defendant's distinctive features. Later upon viewing the surveillance footage, she recognized Defendant's voice, his glasses, his physique and his walk. Again, this is such relevant evidence, from which a reasonable mind could conclude Defendant committed the Trawick Road armed robbery and murder, as well as the Louisburg Road WilcoHess robberies.
The Mexico Lindo robbery also bore similarities to the other crimes. The suspect matched the description given in the other cases. He also jumped over the counter, just like in the Six Forks Road Subway robbery. He used a revolver, and the bullet recovered was linked to the Trawick Road and Six Fork Road robberies. Furthermore, Sharperson recognized the camouflage rain suit shown in surveillance photographs, and Sams recognized Defendant's eyes and his gloves. Again, a reasonable mind could conclude Defendant also committed this crime.
Therefore, we hold, taking the evidence in the light most favorable to the State, the State presented sufficient evidence which a reasonable person could "accept as adequate to support a conclusion" Defendant committed the crimes for which he was convicted. The trial court properly denied Defendant's motions to dismiss the charges. His assignment of error is overruled.
III. Conclusion
For the foregoing reasons, we find no error in the jury's verdicts or in the judgments entered.
NO ERROR.
Report per Rule 30(e).
Judges STROUD and TYSON concur.

The trial court dismissed one charge of armed robbery for insufficient evidence. The jury found Defendant not-guilty of two of the armed robbery charges and not-guilty of one murder charge. In the interest of brevity, this opinion only provides factual background pertinent to those charges for which Defendant was convicted.

The State called Tim Anguish, deputy director of the City County Bureau of Identification. On 23 January 2008, he responded to the Durant Road Subway robbery and he corroborated Officer Lane's testimony.

The State called Dr. Cynthia Gardner, an assistant medical examiner. Dr. Gardner determined the cause of Ms. Anderson's death was a gunshot wound to the chest.

Agent Michael Galloway and Sergeant Michael Galloway are two different witnesses.

The State called Benamara, Mohammed's coworker, who corroborated Mohammed's testimony.

The State called Acosta, who worked with Fernandez-Lucas the night of the incident. Acosta corroborated Fernandez-Lucas's testimony, and she told responding officers she was not able to see the suspect's face.

Tremel-Last performed keyword searches for the following words: "Subway," "WilcoHess," "Anderson," "Mexico Lindo," "revolver," "robbery," "Durant," "robberies," among other words.

Her search of Defendant's hard drive revealed one hundred and eighty-four hits associated with "Subway"; one thousand, thirty associated with "Anderson"; four hundred and forty-two for "revolver"; one thousand, two hundred and seventy-two for "Durant"; one hundred and thirty-eight for "robbery"; seven for "robberies"; none for "WilcoHess"; and none for "Mexico Lindo."

The jury found Defendant not guilty of this crime; therefore, factual background on this robbery was omitted from this opinion.